## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**STATE OF NEW MEXICO,**
        Plaintiff,

vs.                                                    No. 1:14-cv-00695-JAP/SCY

**DEPARTMENT OF THE INTERIOR**
and **SALLY JEWELL**, in her official
capacity as Secretary of the Interior,
        Defendants.

### MEMORANDUM OPINION AND ORDER

On August 27, 2014, Plaintiff the State of New Mexico filed an EMERGENCY

MOTION FOR PRELIMINARY INJUNCTION BY STATE OF NEW MEXICO (Doc. No. 12)

("Motion for Injunction") barring Defendant United States Department of Interior and Sally

Jewell, Secretary of the Interior ("Defendants") from initiating the remedial process found in 25

C.F.R. §§ 291.1–15 (1999) ("Secretarial Procedures").

### BACKGROUND

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221 (1987), the U.S.

Supreme Court held that absent some explicit congressional authorization, States' interests in

regulating gambling within their borders were outweighed by "the compelling federal and tribal

interests supporting" on-reservation gaming. In response to *Cabazon*, Congress enacted the

Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, which had the effect of

giving state governments "a subordinate but significant role in regulating tribal gaming." *Texas*

*v. United States*, 497 F.3d 491, 494 (5th Cir. 2007).

IGRA divides gaming activities into three classes: Class I, Class II, and Class III. Class I

gaming—"social games solely for prizes of minimal value or traditional forms of Indian gaming

engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations,"

25 U.S.C. 2703(6)—is subject to exclusive tribal jurisdiction. 25 U.S.C. § 2710(a)(1). Class II gaming—bingo and non-banked card games, 25 U.S.C. § 2703(7)—are subject to regulation by the National Indian Gaming Commission. 25 U.S.C. §§ 2706(b), 2710(a)–(c). Class III gaming is a catchall that includes all non-Class I & II game types. 25 U.S.C. § 2703(8). If a tribe wishes to conduct on-reservation Class III gaming activities, IGRA requires the tribe to negotiate a gaming compact with the State. 25 U.S.C. § 2710(d)(1)(C).

In exchange for a seat at the negotiating table, IGRA requires States to negotiate Class III gaming compacts in good faith. 25 U.S.C. § 2710(d)(3). IGRA also restricts States' ability to negotiate provisions in the Class III gaming compact to discrete areas relating to the regulation of Class III gaming activities. 25 U.S.C. § 2710(d)(3)(C). IGRA strictly forbids States from taxing Class III gaming activities conducted by a tribe except as necessary to "defray the costs of regulating" Class III gaming activity. 25 U.S.C. § 2710(d)(4).

IGRA allows a tribe to bring suit against a State for failure to conduct compact negotiations in good faith. 25 U.S.C. § 2710(d)(7). Tribes may bring a suit one hundred eighty days after the tribe requests negotiations with the State. 25 U.S.C. § 2710(d)(7)(B). If the court finds the State acted in bad faith, it may order the State and the tribe to execute a compact within sixty days. 25 U.S.C. § 2710(d)(7)(B)(iii). If the parties fail to reach an agreement, the court may then order the parties to enter mediation. 25 U.S.C. § 2710(d)(7)(B)(iv). Under the mediation process, the State and the tribe each submit their most recent "last best offer" for a compact to the mediator. *Id.* The mediator then selects whichever proposal most comports with IGRA, the court's order and findings, and other applicable federal law and submits it to the parties. *Id.*

After all this, the State has one last opportunity to either accept or reject the mediator's proposal. 25 U.S.C. § 2710(d)(7)(B)(v)–(vii). If the State refuses the proposal, IGRA allows the

Secretary of the Interior to create procedures that mimic the mediator's proposed compact and comply with federal law and generally-applicable state laws regulating Class III gambling. 25 U.S.C. § 2710(d)(7)(B)(vii). Once the Secretary adopts procedures, the tribe may conduct Class III gaming on its reservation without the State's assent. 25 U.S.C. § 2710(d)(7)(B)(vii)(II).

In sum,

> [i]n IGRA, Congress meticulously detailed two separate tracks leading to the institution of a Class III tribal gaming business. On the first track, the tribe and the state may negotiate a voluntary compact governing the conduct of gaming activities, which takes effect essentially upon approval by the Secretary. [citation omitted].
>
> The second track begins when no compact has been reached…[in which case the tribe may then ask a court to] order negotiation, then mediation...[then Secretarial Procedures]."

*Texas v. United States*, 497 F.3d 491, 494 (5th Cir. 2007).

IGRA's complex remedial scheme was thrown into disarray by *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1994). In *Seminole Tribe*, the U.S. Supreme Court held that Congress had no authority under the U.S. Constitution to subject States to suits filed by Indian tribes seeking a declaration of bad faith failure to negotiate a Class III gaming compact. *Id.* at 47. *Seminole Tribe* created " a major loophole through which States could shield themselves from IGRA's conflict resolution process by asserting sovereign immunity[.]" Defendants' Response, Doc. No. 19 at 7.

To preserve IGRA's remedial scheme and mitigate the trump card that *Seminole Tribe* gave States, Defendants created regulations allowing a tribe to obtain Class III gaming procedures similar to those described in 25 U.S.C. § 2710(d)(7)(B)(vii)(II). The regulations provide that when, as here, "[a] State and an Indian tribe are unable to voluntarily agree to a compact" and "[t]he State has asserted its immunity from suit brought by an Indian tribe under

25 U.S.C. 2710(d)(7)(B)," 25 C.F.R. § 291.1 (1999), then an Indian tribe may use the Secretarial

Procedures to obtain permission to operate Class III gaming without the State's consent. *See*

August 22, 2014 Letter from Kevin K. Washburn, Asst. Sec'y – Indian Affairs, to New Mexico

Governor Susana Martinez, Doc. No. 13-1; *see also* Doc. No. 19 at 8–9 (explaining the history of

the Secretarial procedures).

## PROCEDURAL HISTORY

In December 2013, the Pueblo of Pojoaque filed a complaint against the State of New

Mexico for failing to conduct negotiations in good faith to achieve a renewed gaming compact,

as required by 25 U.S.C. § 2710(d)(3)(A). *See* COMPLAINT [FAILURE TO CONCLUDE

COMPACT NEGOTIATIONS IN GOOD FAITH], Doc. No. 1, Case No. 1:13-cv-01186-JAP-

KBM (Dec. 13, 2013).

After New Mexico did not respond to the Pueblo's complaint, this Court entered a default

judgment. New Mexico then sought and obtained relief from the default judgment and requested

dismissal of the Pueblo's claims based on its immunity from suit under U.S. CONST. amend. XI.

*See* ORDER DISMISSING CASE, Doc. No. 22, Case No. 1:13-cv-01186-JAP-KBM (Mar. 3,

2014). After its bad faith claim was dismissed and subsequent negotiations failed to produce a

gaming compact, the Pueblo asked the Department of the Interior ("Department") to initiate

Secretarial Procedures for issuing the Pueblo Department approval to operate Class III gaming.

In a letter dated August 22, 2014, the Department notified the Pueblo and New Mexico

that the Pueblo was eligible for Secretarial Procedures. Doc. No. 13-1. New Mexico represents

that Defendants are unwilling to delay initiation of the Secretarial Procedures beyond September 16, 2014.[1] Doc No. 13 at 10. New Mexico then filed a Motion for Injunction (Doc. No. 12).

## DISCUSSION

### A.  JURISDICTION

In its Complaint for Declaratory and Injunctive Relief (Doc. No. 1), New Mexico argues that this Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

The Defendants argue that because the Secretarial Procedures are not yet final agency actions, New Mexico's claims fall outside the United States' limited waiver of sovereign immunity in the Administrative Procedure Act. *See* Doc. No. 19 at 13. The Defendants also argue that because New Mexico does not have standing and its claims are not ripe, this Court likewise does not have jurisdiction under U.S. Const. Art. III. *See* Doc. No. 19 at 18.

For the reasons that follow, this Court finds that the challenged agency action is final, New Mexico has standing, and its claims are ripe for review. Therefore, this Court has subject-matter jurisdiction under the Administrative Procedure Act and has Article III jurisdiction over New Mexico's claims.

The Defendants further argue that to the extent New Mexico seeks to make a facial challenge to the Secretarial Procedures, such a challenge is barred by the six-year statute of limitations on APA challenges, which began to run when the Department published the Secretarial Procedures in the Federal Register in 1999. *See* 28 U.S.C. § 2401(a). Because New

---

[1] Defendants have signaled their willingness to delay the Procedures in order to allow the Court enough time to consider New Mexico's motion.

Mexico explicitly disclaims any facial challenge to the regulations in its Reply (Doc. No. 24), this Court need not rule on the Defendants' argument.

## B.  LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate the following:

(1)      It is likely to succeed on the merits;

(2)      It will suffer irreparable harm in the absence of a preliminary injunction;

(3)      The balance of equities tips in the party's favor; and

(4)      The injunction would serve the public interest.

*Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010). The parties disagree about the weight this Court should give each factor. New Mexico contends that if it makes "a strong showing on some of the factors," it has a "reduced burden on the other factors." Doc. No. 13 at 10 (citing *Longstreth v. Maynard*, 961 F.2d 895, 903 (10th Cir. 1992)). The Defendants argue that a moving party enjoys a lesser showing on its likelihood of success on the merits only if it establishes the three other factors. Doc. No. 19 at 11 n. 3.

This Court finds that the moving party must make a showing on all four of the factors in order to be entitled to a preliminary injunction. Although Tenth Circuit precedent on this point is unclear, recent opinions suggest that a court cannot ignore any of the required factors, even if the moving party makes a strong showing on one. *See Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) (unpublished) ("A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor.") (emphasis original) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**C. DISCUSSION**

1. Likelihood of success on the merits

   a. Standing

In order to meet Article III's standing requirement, the State must show the Secretarial Procedures are causing an "injury in fact" which would be remedied by a favorable decision from this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Supreme Court defines an "injury in fact" as an invasion of a "legally protected interest" that is "concrete and particularized, not 'conjectural' or 'hypothetical.'" *Id.* (quotations omitted). Normally, a plaintiff must show that he is "himself an object of the action (or forgone action) at issue" when he seeks to challenge "the legality of government action or inaction[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants argue that if the Secretarial Procedures target anyone, it is the Pueblo, because the Procedures regulate its ability to conduct Class III gaming activities. This Court disagrees. The Secretarial Procedures target the right that the State seeks in this action to defend: its right to prevent the Pueblo (and other tribes similarly situated) from conducting Class III gaming activities without obtaining a compact.

New Mexico alleges injury in fact to three allegedly distinct interests: 1) its bargaining position in ongoing negotiations with the Pueblo and other tribes; 2) its "dignitary" interest arising from its Eleventh Amendment sovereign immunity; and 3) its economic interest in avoiding the costs of participating in the allegedly illegal administrative process.

New Mexico argues that the Secretarial Procedures give the Pueblo a potential alternate route to obtaining the legal right to conduct Class III gaming activities, and as such diminishes the State's bargaining position in ongoing compact negotiations. Defendants respond that New

Mexico's motion to dismiss the Pueblo's bad faith lawsuit before filing the instant case is what harmed its statutory bargaining position, not the Secretarial Procedures, which can only be invoked after the State has obtained dismissal of a tribe's bad faith action by invoking its immunity from suit. *See* 25 C.F.R. § 291.3(d) (1999).

This Court is not persuaded that New Mexico's current bargaining position is a legally protected interest. First, it is unclear that a diminished bargaining position unaccompanied by identifiable economic harm, such as a less favorable revenue sharing agreement, is sufficient to confer Article III standing. *See Texas v. United States*, 497 F.3d 491, 497 n. 1 (5th Cir. 2007) ("[I]t is unclear whether a reduction in bargaining power unaccompanied by economic injury or other concrete injury can constitute an injury in fact.").

Moreover, the harm to New Mexico's bargaining position with the Pueblo is insufficiently concrete to confer Article III standing. Although New Mexico's sovereign status entitles it to special solicitude in determining Article III standing, the fact remains that New Mexico's diminished bargaining position remains a "generalized grievance" that does not confer standing unless it can provide more specific evidence of its weakened bargaining position. *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012).

New Mexico next argues that it has suffered Article III injury in fact because the Secretarial Procedures "harm[] the State's unique sovereign status." Doc. No. 13 at 13 (citing *Massachusetts v. EPA*, 549 U.S. 497, 518, 519–20 (2007)). Texas made a similar argument that persuaded the Fifth Circuit, which found that Texas had suffered an injury in fact by being forced either to participate in the allegedly illegal administrative process or forfeit its one chance to comment on the tribe's proposed Class III gaming procedures. *Texas v. United States*, 497

F.3d 491, 497 (5th Cir. 2007) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 582 (1985)). This Court, however, is not persuaded by the *Texas* court's reasoning.

*Texas*'s holding relied on *Union Carbide*, which in turn held that being forced to adjudicate a claim for compensation under the Fifth Amendment before an arbitrator and not an Article III judge was a concrete injury conferring Article III standing because the panel's unconstitutional assertion of jurisdiction over the party was itself an injury. *Union Carbide*, 473 U.S. at 580. Unlike the arbitration proceeding in *Union Carbide*, the Secretarial Procedures do not assert jurisdiction over New Mexico–that is, the power to create an enforceable resolution of the conflict between New Mexico and the Pueblo over its failure to negotiate in good faith. Rather, the Secretarial Procedures are the Department's effort to exercise its statutory power to institute Class III procedures without a state's consent under IGRA and its general power over Indian affairs in 25 U.S.C. §§ 2, 9.

If this Court determines that the Secretarial Procedures are invalid, it will be because they are not permitted by IGRA, which gave States a statutory right to a gaming compact with tribes where none had existed before. The issue here is whether Defendants had statutory authority to issue the Secretarial Procedures. New Mexico's claim that the mere choice to participate in the Secretarial Procedures injures its sovereign immunity must fail because any right it has to invalidate the Procedures stems from its rights under IGRA, not the constitution. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) ("[T]he Act grants the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands").

Finally, New Mexico argues that IGRA itself gives rise to a legally-protected interest in preventing Indian tribes from conducting Class III gaming in New Mexico without first negotiating a compact with the State. Doc. No. 13 at 13. If the Secretarial Procedures are upheld,

the State argues, Indian tribes will "engage in surface bargaining for 180 days, file suit against States they know have not waived their Eleventh Amendment rights, and then request Secretarial Procedures," which will result in New Mexico having a "radically diminished" negotiating position against tribes. *Id.*

  This Court agrees that by circumventing a State's statutory right to negotiate a compact or to have a bad faith determination made in federal court, the Secretarial Procedures cause New Mexico to suffer an injury in fact. The Secretarial Procedures create a concrete likelihood that the Pueblo will obtain legal authority to conduct Class III gaming activities on its land without first negotiating a compact with New Mexico, as required by 25 U.S.C. § 2710(d)(1)(C). Consequently, the Court concludes that the State has standing to challenge the legality of the Secretarial Procedures insofar as they could permit the Pueblo to continue Class III gaming activities without first negotiating a compact with New Mexico or obtaining a declaration from a federal district court that New Mexico has acted in bad faith if those negotiations fail.

  Insofar as the State alleges the Secretarial Procedures cause ongoing harm to New Mexico's statutory interest in preventing tribes from conducting Class III gaming on-reservation without first negotiating a compact agreement with New Mexico, this Court is persuaded that a favorable ruling will redress New Mexico's claimed injuries.

  Because New Mexico has shown it has suffered an injury in fact that is caused by the Secretarial Procedures which would be redressed by a ruling on the merits of its claims, it has standing to pursue its claims.

  b. Ripeness

  An agency decision is ripe for judicial review when the issues raised are fit for judicial determination and withholding such determination will cause hardship on the parties involved.

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). A challenge to agency regulation is ripe for judicial determination if the plaintiff's challenge presents "purely legal" questions, the complained-of regulation is a final agency action, and additional facts would not "significantly advance [the court's] ability to deal with the legal issues presented." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003).

The Tenth Circuit also weighs the following additional factors: 1) whether the action has or will have a "direct and immediate impact" on the plaintiff and 2) whether the resolution of the plaintiff's claims will "promote effective enforcement and administration by the agency." *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001) (quoting *HRI, Inc. v. EPA*, 198 F.3d 1224, 1235–36 (10th Cir. 2000)).

The Defendants do not dispute that New Mexico's challenge to the Secretarial Procedures raises purely legal questions. Instead, it contends the Secretary's eligibility determination was not a "final agency action" under the APA, 5 U.S.C. § 704, and the Procedures cause no "direct and immediate impact" on New Mexico. Defendants further argue that a preliminary injunction will harm their ability to effectively enforce and administer IGRA.

  i.  Whether the Secretary's eligibility determination is a final action subject to judicial review under the APA

The APA allows judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA defers review of "preliminary, procedural, or intermediate agency action or ruling not directly reviewable" until review of the final agency action. *Id.* Agency action is "final" if it 1) marks "the consummation of the agency's decisionmaking process," and 2) determines rights, obligations, or legal consequences. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

The Defendants argue the Secretarial Procedures are not final until the Secretary approves or issues Class III gaming procedures that give the Pueblo legal authority to conduct Class III gaming on its reservation. The State, in turn, cites the text of the Secretarial Procedures, which states the Secretary's eligibility determination is "final." 25 C.F.R. § 291.6(b) (1999).

A short summary of the Secretarial Procedures process is necessary. A tribe may only use the procedures after it has followed the remedial process in IGRA, including filing suit against the State for failing to negotiate in good faith. 25 C.F.R. § 291.3 (1999). Once the State has invoked its sovereign immunity and the suit has been dismissed, the tribe may submit a proposal to the Department of Interior containing detailed information about the tribe's proposed gaming procedures. 25 C.F.R. § 291.4 (1999). This includes records of the tribe's past negotiations with the State and a proposed "[r]egulatory scheme for the State's oversight role, if any, in monitoring and enforcing compliance." *Id.* Once the Department verifies that the tribe's negotiations with the State have failed and that the State dismissed the tribe's bad faith lawsuit by invoking its sovereign immunity, the Secretary issues a "final" determination that the tribe is eligible for the Secretarial Procedures. 25 C.F.R. § 291.6 (1999). Once this eligibility determination is made, the Department solicits comments from the State. 25 C.F.R. § 291.7 (1999). The State may object to the tribe's proposal and even propose its own. *Id.*

If the State refuses to submit comments or an alternative proposal, the Secretary independently determines whether the tribe's proposal meets the following requirements:

(1) Whether all requirements of [25 C.F.R.] § 291.4 [i.e., the initial procedures eligibility determination] are adequately addressed;
(2) Whether Class III gaming activities will be conducted on Indian lands over which the Indian tribe has jurisdiction;
(3) Whether contemplated gaming activities are permitted in the State for any purposes by any person, organization, or entity;

(4) Whether the proposal is consistent with relevant provisions of the laws of the State;

(5) Whether the proposal is consistent with the trust obligations of the United States to the Indian tribe;

(6) Whether the proposal is consistent with all applicable provisions of IGRA; and

(7) Whether the proposal is consistent with provisions of other applicable Federal laws.

25 C.F.R. § 291.8 (1999). At this point, the Department may approve or disapprove of the tribe's proposal, and that is the end of the matter. 25 C.F.R. § 291.8(b)–(c) (1999).

If the State makes an alternate proposal, the Secretary must appoint a mediator with "no official, financial, or personal conflict of interest with respect to the issues in controversy" who then seeks to "resolve differences between the two proposals." 25 C.F.R. § 291.9 (1999). After hearing evidence and argument from both sides, the mediator selects the proposal that "best comports with the terms of IGRA and any other applicable Federal law." 25 C.F.R. § 291.10 (1999).

After the mediator selects a proposal, the Department has 60 days to either approve or disapprove of the selected proposal. 25 C.F.R. § 291.11 (1999). The regulations outline a discrete set of permissible grounds for denying the mediator's selected proposal. If the Department rejects the mediator's proposal, then it must nonetheless approve of procedures for the conduct of Class III gaming, taking into account the mediator's proposal, IGRA, and relevant state law. *Id.*

This Court is convinced the Secretary's eligibility determination is a "final agency action" because the Secretarial Procedures themselves say the eligibility determination is final. Once the determination is made, the Secretary's discretion to either approve or disapprove Class III gaming procedures for the tribe is constrained: to be sure, the Secretary may disapprove of a

13

mediator's proposed procedures for various reasons. 25 C.F.R. § 291.11(b) (1999). But such a result seems, at least at this point in time, to be a highly unlikely outcome.

In sum, legal consequences flow from the Secretary's eligibility determination: if the Secretarial Procedures are allowed to run their course, the Pueblo likely *will* receive the legal authority to conduct Class III gaming on its lands unless the State strikes a compact agreement with the Pueblo beforehand. This result flows directly from the eligibility determination, and is therefore a final agency action under the APA.[2]

ii.      Whether New Mexico is directly impacted by the Secretarial Procedures

Defendants next argue that New Mexico's claim is unripe because the Secretarial Procedures do not directly impact the State. Defendants urge this Court to adopt the reasoning of the court in *Alabama v. United States*, 630 F. Supp. 2d 1320 (S.D. Ala. 2008). In that case, the court held that Alabama's challenge to the Secretary's eligibility determination was unripe because the determination itself had no effect on the "primary conduct" of the State. *Id.* at 1331 (quoting *Nat'l Park Hospitality Ass'n*, 538 U.S. 803, 810 (2003)). Defendants contend that New Mexico is not impacted by the Secretarial Procedures because it remains "free to conduct itself as it wishes, negotiating or not with the Pueblo outside the administrative process[,]…participating in the process[,]…or ignoring it without fear of penalty imposed by the agency." Doc. No. 19 at 16.

New Mexico argues the Secretary's eligibility determination impacts it because it allows the Secretary to "illegally assume[] a role in the compacting process that undermines State

---

[2] Defendants also state that because the eligibility determinations are not final agency actions, New Mexico's claims fall outside the United States' limited waiver of sovereign immunity in the APA. Doc. No. 19 at 13. Because this Court has decided that the Secretary's eligibility determination is a final agency action, New Mexico's claims necessarily fall within the United States' waiver of its immunity from suit.

prerogatives, and…[forces] New Mexico to choose between participating in an illegal proceeding or forgoing its right to regulate [C]lass III gaming within its borders." Doc. No. 13 at 17.

Ultimately, whether the Secretary's eligibility determination has a sufficient impact on the State to satisfy ripeness requirements turns on the relationship between the State and the Pueblo before the eligibility determination as compared to their relationship prior to the *Seminole* decision. Defendants argue the eligibility determination merely restores the "balance between Tribes and States" in the negotiation process under IGRA, preventing States from using their sovereign immunity as "leverage to secure compact terms unfairly benefitting themselves[.]" Doc. No. 19 at 8. In other words, the Defendants argue that this Court should determine whether the State is impacted based on what its negotiating position with the Pueblo was *before* the Supreme Court held that States could not be sued under IGRA's statutory remedial scheme.

New Mexico in effect argues that the Secretary's eligibility determination prevents it from using its sovereign immunity as a trump card in the compact negotiation process to force the Pueblo to accept its compact terms. This line of argument is not beyond the pale: it is conceivable that the Supreme Court intended this very result when it rejected the Seminole Tribe's alternate argument that IGRA could be enforced against the States under the doctrine of *Ex Parte Young*. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73–73 (1996).

This Court concludes that *Seminole Tribe* and its effect on the compact negotiations process cannot be ignored in determining whether the Secretarial Procedures have impacted New Mexico. New Mexico may indeed be using the holding in *Seminole* to prevent the Pueblo from seeking a court order forcing New Mexico to negotiate in good faith. But this newfound position of strength is the new reality of the compact negotiation process. The Secretarial Procedures,

which seek to prevent New Mexico from using its immunity from suit to its advantage in the

negotiations process, have a direct impact on New Mexico's position and therefore satisfy this

element of the ripeness inquiry.

      iii.    Whether a court declaration that the Secretarial Procedures are illegal will harm
the Secretary's ability to effectively enforce and administer IGRA

Defendants argue that a preliminary injunction will hinder, not help, their efforts to

administer IGRA. Defendants say that a preliminary injunction will "impair[] the purpose of the

regulations," which is to resolve the "stalemate that can arise when a state asserts its sovereign

immunity to avoid application of IGRA's remedial provisions." Doc. No. 19 at 17 (quotation

omitted). Defendants have submitted an affidavit from Kevin K. Washburn, Assistant Secretary

of Indian Affairs (Doc. No. 19-2 ("Washburn Declaration")), in which Assistant Secretary

Washburn describes the Secretarial Procedures process as "complex and time-consuming," i*d.* at

4, and that the Department cannot indefinitely delay execution of the process because it is

necessary to help tribes avoid the "great uncertainty" of expired gaming compacts. *Id*. at 3.

A preliminary injunction would hinder the Defendants' "effective enforcement and

administration" of IGRA and the Secretarial Procedures. *Mobil Exploration & Producing U.S.,

Inc. v. Dep't of Interior*, 180 F.3d 1192, 1204 (10th Cir. 1999). But Defendants conflate ripeness

with the equitable concerns that this Court will consider in determining whether to grant a

preliminary injunction. The question here is whether the Defendants will be better able to

administer the Secretarial Procedures with a court ruling on the merits of New Mexico's claims,

not whether the harm caused by such a preliminary injunction outweighs New Mexico's claimed

harm. Seen in this light, the ripeness inquiry resolves itself: a ruling on the merits will assist the

Secretary because it will provide necessary clarity to the Secretary's authority to use the procedures.

    c.   Whether the Secretarial Procedures exceed the Secretary of the Interior's statutory authority

The State argues that it will prevail on the merits because the language of IGRA's remedial provisions is so clear and unambiguous that "Congress has directly spoken to the precise question" in this case—namely, whether or not the Pueblo may obtain Secretarial Procedures without first obtaining a judicial declaration of bad faith. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Defendants counter that *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) created an ambiguity in the statute that gave the Secretary gap-filling authority to create the Secretarial Procedures. Doc. No. 19 at 20.

Defendants first point to the 25 U.S.C. § 2710(d)(7)(B)(vii), which grants the Secretary of the Interior authority to promulgate procedures for Class III gaming if a State refuses to agree to a compact, even after a judicial finding of bad faith and IGRA remedial process. As the Eleventh Circuit explained, a State's invocation of its Eleventh Amendment immunity from suit need not short-circuit IGRA remedial process:

> [W]hat procedure is left for an Indian tribe faced with a state that not only will not negotiate in good faith, but also will not consent to suit[?] The answer, gleaned from the [IGRA], is simple. One hundred and eighty days after the tribe first requests negotiations with the state, the tribe may file suit in district court. If the state pleads an Eleventh Amendment defense, the suit is dismissed, and the tribe, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii), then may notify the Secretary of the Interior of the tribe's failure to negotiate a compact with the state. The Secretary then may prescribe regulations governing class III gaming on the tribe's lands. This solution conforms with IGRA and serves to achieve Congress' goals, as delineated in §§ 2701–02.

*Seminole Tribe of Florida. v. Fla.*, 11 F.3d 1016, 1029 (11th Cir. 1994) *aff'd*, 517 U.S. 44 (1996). This solution (if it is one), is beguilingly attractive because it interprets a State's use of sovereign immunity as a "rejection" of the compact selected by the mediator and submitted to the State under 25 U.S.C. § 2710(d)(7)(B)(v).

Unfortunately, under IGRA the Secretary may only issue such procedures after a federal court makes a finding of bad faith and appoints a mediator who selects a compact the State has one further chance to accept or reject. 25 U.S.C. § 2710(d)(7)(B)(iv)(v). Thus the question becomes whether IGRA's jurisdiction-granting clause (25 U.S.C. § 2710(d)(7)(A)) is ambiguous, and if so, whether the Secretarial Procedures are a reasonable means of resolving this ambiguity.

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), is less persuasive on this point, since only one judge on the three-judge panel found IGRA's jurisdiction-granting clause unambiguous under step one of the *Chevron* analysis. Judge Carolyn King, who concurred only with Chief Judge Edith A. Jones' judgment and her ruling that Texas's challenge was justiciable, found that "the lack of any provision in the [IGRA] addressing the dismissal of an Indian tribe's enforcement suit on sovereign immunity grounds is a statutory gap[.]" *Id.* at 511 (King, J., concurring in the judgment). Judge King nevertheless found that the Procedures went " beyond the mere effectuation of [the] IGRA's provisions into the realm of wholesale statutory amendment." *Id.* at 512 (citing *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006)).

Here, the parties' legal positions boil down to arguing over what exact issue Congress has or has not "directly spoken" to in IGRA. The State maintains the issue is the Secretary's authority to issue Procedures, which IGRA clearly says may only happen once a federal district court has made a finding of bad faith. Doc. 13 at 18. Defendants argue IGRA does not provide for a State's invocation of its Eleventh Amendment immunity from suit in order to avoid a

determination of bad faith that would (ultimately) allow the implementation of Secretarial Procedures. Doc. No. 19 at 20.

In order to determine whether a statute is ambiguous under step one of the *Chevron* analysis, courts are asked to employ "traditional rules of statutory construction[.]" *Chevron, Inc. v. Natural Res. Def. Counsel*, 467 U.S. 837, 943 n. 9 (1984). But here the Court must reconcile two competing canons: *Chevron* deference and *stare decisis*. Is *Seminole Tribe* now "part of" IGRA, "a building block upon which private parties, Congress, and the Court itself build[?]" Rebecca White, *The Stare Decisis "Exception" to the* Chevron *Deference Rule*, 44 FLA. L. REV. 723, 748 (1992) (quotation omitted). Or does it leave the clarity of IGRA's remedial scheme untouched, and therefore unambiguous?

The Court need not decide this issue now, because the question before it is only whether New Mexico has met its demanding burden of showing a *substantial* likelihood of success on the merits. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). This Court concludes that New Mexico, at this point, has not demonstrated a *substantial* likelihood of success on the merits. The only court of appeals case in which the precise issue was addressed resulted in a split decision with three opinions. A final decision on the issue is best left to a ruling on cross motions for summary judgment which the parties are to file promptly.

2.  Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual "and not theoretical."" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985)). A showing of irreparable harm sufficient to justify an award of injunctive relief requires a greater showing than injury in fact sufficient for Article III standing. *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 1002 (D. Mont.

2013) (citing cases); *see also In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) ("a plaintiff must do more [to show irreparable harm] than merely allege harm sufficient to establish standing" (internal quotation and alteration omitted)).

New Mexico asserts three types of irreparable harm: 1) The Secretarial Procedures "diminish [its] bargaining position in its ongoing negotiations [with the Pueblo];" 2) participation in the Secretarial Procedures will cause "dignitary harms [to the State]…by being forced by the Secretary to participate in a process that she has no authority to impose;" and 3) the State will have to invest "time and resources…to protect its interests during the administrative proceeding." Doc. No. 13 at 22.

    a.   <u>Reduced bargaining power</u>

New Mexico cites the Fifth Circuit's analysis in *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007) in support of its argument the Secretarial Procedures cause it irreparable harm. But *Texas*, though favorable to New Mexico's arguments on the merits, is far less helpful to New Mexico's "bargaining power" argument. First, the *Texas* court's discussion of the plaintiff's injuries was in the context of determining Article III standing, not irreparable harm. Second, even assuming a showing of injury in fact is sufficient to demonstrate irreparable harm, the *Texas* court rejected Texas's argument that a reduction in bargaining power, without some showing of concrete economic harm, can confer standing. *Texas*, 497 F.3d at 496–7. Without a more concrete showing of immediate injury, New Mexico's reduced bargaining power alone is insufficient to constitute irreparable harm.

b. Dignitary harm

New Mexico next argues the Secretarial Procedures cause irreparable "dignitary harms" by forcing it to make what it calls a "Hobson's choice" (Doc. No. 13 at 17)[3]: either "participat[e] in this allegedly invalid process…or forfeit its sole opportunity to comment" on Pojoaque's proposed gaming regulations. (Doc. No. 13, at 22) (quoting *Texas*, 497 F.3d at 497)).

Defendants argue the State's claims of "dignitary harms" are "of its own making and too ineffable to be considered certain, great, actual and not theoretical." Doc. No. 19 at 25(quotation omitted). The State cites *Fed. Mar. Comm'n v. S.C. Ports Auth.*, 535 U.S. 743, 744 (2002) for its assertion that participating or withholding participation in an unlawful administrative proceeding results in irreparable harm.[4] Without passing on the question of whether the Secretarial Procedures are "the type of proceeding[] from which the Framers would have thought the States possessed immunity when they agreed to enter the Union[,]" *id.*, this Court finds *S.C. Ports Auth.* distinguishable. The administrative procedures at issue in that case were found to be coercive because they prevented the State from abstaining and subsequently litigating the merits of its position in a later action to enforce the administrative order in federal court. *Id.* at 745. Here, New Mexico faces no such coercion: Defendants freely admit that no matter what decision New Mexico takes with respect to its participation (formal or informal) in the Secretarial Procedures, it retains its ability to challenge the legality of the procedures in court. Doc. No. 19 at 4.

_____

[3] Technically, "Hobson's choice…denote[s] no choice at all—either taking what is offered or taking nothing at all." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 404 (2nd ed. 1995). Here, the State uses the term in its "prevailing sense" in American English: "not that of having no choice at all, but of having two bad choices." *Id.*

[4] The State also cites *P.R. Aquaduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 US 139 (1993), but does not say why that case (which concerned whether a denial of Eleventh Amendment immunity was subject to the collateral order doctrine) supports the State's argument.

Finally, New Mexico's claimed dignitary harm is not so "*imminen[t]* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotation omitted) (emphasis original). New Mexico's ability to challenge the legality of the procedures does not turn at all on its decision to participate or abstain. *See* Doc. No. 1. Moreover, New Mexico may protect its dignity by refraining from participating in the allegedly illegal administrative process.[5]

c.   Expense of participation in the administrative proceedings

The State next argues the Secretarial Procedures are causing irreparable harm in the form of "time and resources that the State will invest to protect its interests during the administrative proceeding[.]" Doc. No. 13 at 22. But it is well-established that "simple economic loss usually does not, in and of itself, constitute irreparable harm[.]" *Heideman v. S. Salt Lake City*, 348 F. 3d 1182, 1189 (10th Cir. 2003).

The rule that lost money is insufficient to show irreparable harm is based on the idea that money damages can compensate for such losses once there is a ruling on the merits of the plaintiff's claims. *See id.* While New Mexico may ultimately be unable to obtain such damages from the Defendants, it does not explain why its participation in the Secretarial Procedures process will be any more costly than negotiating in good faith with the tribe, as IGRA requires. Without showing more, the State has failed to establish that the economic costs of participating in administrative proceedings constitute irreparable harm.

_____

[5] New Mexico does not point to any evidence the Class III gaming procedures selected by the Secretary will be more unfavorable to the State if it chooses not to participate. Indeed, it explicitly disclaimed such an argument while arguing that its challenge was ripe for judicial review. *See* Doc. No. 13 at 16.

3.   Balance of Equities

"To be entitled to a preliminary injunction, the movant has the burden of showing that the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Heideman*, 348 F.3d at 1190.

New Mexico argues that a preliminary injunction will cause no harm to the Defendants because the injunction will "prevent the Secretary from expending time and resources on an illegal proceeding." Doc. No. 13 at 23. New Mexico argues that the Secretary's willingness to withhold issuing procedures until March 2015 demonstrates its point that a preliminary injunction will not harm Defendants.

Defendants respond that a preliminary injunction will cause them harm because it will interrupt the "complex" set of processes that must be complete before procedures are issued. *See* Washburn Declaration at 4. In other words, Defendants say that their willingness to hold back issuance of procedures until after the 2015 Legislative session does not mean that they can hold off on the process until then; they still need the intervening months to formulate the final procedures and issue them if the legislature fails to move the State any closer towards a compact with the Pueblo.

By the Secretary's own reckoning, a preliminary injunction would not seriously impact the Secretary's ability to issue procedures before the expiration of the Pueblo's compact in 2015, so long as the injunction is either terminated or made permanent by January 2015. But despite the State's assertion that the issues in this case are "relatively simple," Doc. No. 13 at 23, this Court has no way of knowing whether or not the issues in the State's complaint will be resolved in time for the Secretary to issue procedures, taking into account the time that might be required

to obtain appellate review either of this Court's denial of New Mexico's Motion for Injunction or an eventual ruling on the merits.

Defendants and Amicus Pueblo of Pojoaque also argue that a preliminary injunction will increase the likelihood that the Pueblo will be without a valid gaming compact in July 2015, which would cause untold economic harm to the Pueblo and the people who depend on it for their livelihoods.

The Pueblo of Pojoaque may indeed face dire economic consequences if the 2001 compact expires. *See* Doc. No. 21-1 at 20 (Brief of Amicus Pueblo of Pojoaque). But although an injunction barring Defendants from using the Secretarial Procedures would eliminate one potential avenue for the Pueblo to preserve its legal authority to conduct Class III gaming activities, any connection between a preliminary injunction and the Pueblo's claimed harm is too vague and speculative.

This Court concludes, however, that the balance of harms slightly favors Defendants because a preliminary injunction would disrupt its ability to see out the Secretarial Procedures process before the Pueblo's current compact with New Mexico expires.

4. Public interest

Defendants argue that a preliminary injunction will not serve the public interest because the overriding purpose of IGRA and the Secretarial Procedures is to "ensure gaming by Tribes and…"promoting tribal economic development, self-sufficiency, and strong tribal governments."" Doc. No. 19 at 26 (quoting 25 U.S.C. § 2702(1)). New Mexico says that the public has an interest in halting the Defendants' ongoing violation of federal law. Doc. No. 13 at 24.

24

This Court appreciates New Mexico's great interest in protecting its rights under IGRA and vindicating its interests in regulating Class III gaming within its territory. But New Mexico's argument is misplaced. Congress put an intricate remedial structure in place to balance competing State, tribal, and federal interests. New Mexico has used its immunity from suit to prevent the Pueblo and other tribes similarly situated from obtaining a court determination of New Mexico's adherence to its obligations under IGRA. New Mexico is within its rights to challenge the Secretarial Procedures in order to ensure compact negotiations with the State remain the sole avenue for tribes to conduct Class III gaming. But because New Mexico's tactics run contrary to Congress's announced purpose in passing IGRA, this Court finds that a preliminary injunction would not serve the public interest.

**CONCLUSION**

The State of New Mexico has failed to show a *substantial* likelihood of success on the merits, that it will suffer irreparable harm without a preliminary injunction, that the balance of equities is in its favor, or that the public interest is served by an injunction. Accordingly, this Court will DENY New Mexico's Motion for Injunction (Doc. No. 12).

IT IS ORDERED THAT Plaintiff's EMERGENCY MOTION FOR PRELIMINARY INJUNCTION BY STATE OF NEW MEXICO (Doc. No. 12) is DENIED.

SENIOR UNITED STATES DISTRICT JUDGE