**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

THE STATE OF NEW MEXICO,

    *Plaintiff,*

 v.

DEPARTMENT OF THE INTERIOR, *et al*.,

    *Defendants.*

No. 14-cv-695-JAP/SCY

**MOTION FOR SUMMARY
JUDGMENT**

### INTRODUCTION

In the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*, Congress balanced the states' concerns "that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands" with tribes' objections to state jurisdiction over tribal lands. S.Rep. No. 100-446, at 13 (1988). It did so by prohibiting such gaming, *except* when conducted under the terms of a tribal-state compact.

Congress delegated to the Secretary of the Interior two limited roles in the compacting process. First, the Secretary must review a *final* compact negotiated between a state and a tribe and decide whether to reject it, approve it, or simply allow it to go into effect. 25 U.S.C. § 2710(d)(8). Second, if a tribe and a state cannot agree on the terms of a compact, and if a federal court determines that the state negotiated in bad faith, and if all efforts at reaching agreement through judicially-mandated mediation have failed, the Secretary can then—and only then— implement "gaming procedures" allowing class III gaming. *Id.* § 2710(d)(7). Using unusually clear and specific language, Congress carefully circumscribed the Secretary's role to those two circumstances.

In 1996, the Supreme Court held that Congress does not have the power to abrogate the sovereign immunity of nonconsenting states to authorize suits by Indian tribes to enforce IGRA's "good faith" requirement. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). Thus, in those cases where states do not waive their sovereign immunity, the Secretary's limited authority to prescribe gaming procedures is never triggered. In 1999, however, the Secretary promulgated regulations creating a regulatory process that culminates in the imposition of gaming procedures on any state that refuses to consent to a tribe's suit.

This case raises two basic questions. Can the Secretary promulgate regulations to prescribe gaming procedures in circumstances other than the single circumstance Congress explicitly identified?  And, even if she can, are the regulations that the Secretary did devise and apply to New Mexico permissible under the Act? The answer to each question must be no.

Only Congress can delegate authority to the Secretary to take action, and the authority Congress did delegate is explicit and limited. That the Secretary may not play the role Congress devised in certain cases does not change the plain language of the statute, nor does it mean that she has the power to devise her own solution to a problem Congress either did not contemplate or chose not to address. The Secretary's argument that a subsequent judicial decision can create "ambiguity" or a "gap" where the statutory language is unusually clear is nothing more than an attempt to appropriate power Congress did not grant to solve a "problem" that is Congress's job to address through careful consideration of the interests and policies at stake.

Nor can the effect of a judicial decision change the language Congress chose to enact. The statutory language evinces congressional intent, and reading IGRA as if a provision did not exist would result in the Court, rather than the Secretary, rewriting the statute to give the Secretary power where Congress did not. The Supreme Court found § 2710(d)(7) to be "unmistakably clear" in its intent, with "intricate procedures" for implementing a "detailed remedial scheme"; such a scheme leaves no room for deference. To the extent there is any doubt

on that point, the Court should construe the statute to avoid the serious constitutional difficulties that would be raised by the Secretary's interpretation: most critically, that the effect of the Secretary's regulations is to coerce states into surrendering their constitutionally guaranteed sovereign immunity.

In addition, the regulations the Secretary promulgated violate IGRA by giving her far more power over gaming procedures than the narrow role Congress assigned her in the statute. The regulations do not require a determination that a state have negotiated in bad faith before procedures are imposed; they do not provide for a court-appointed mediator; they do not require that the Secretary accept a mediator's proposal if the state agrees; and they provide far greater opportunity for the Secretary to substitute her own judgment for the tribe's, the state's and the mediator's. Even if the Secretary has the power to promulgate regulations, these regulations provide none of the safeguards that Congress determined appropriate.

Either way, the Secretary's application of the Part 291 regulations to the State of New Mexico on behalf of the Pueblo of the Pojoaque violates IGRA. The Part 291 regulations should be declared contrary to law, and the Secretary should be enjoined from imposing gaming procedures on the State.

## LEGAL BACKGROUND

### A.     The Indian Gaming Regulatory Act's Compacting Requirement

IGRA establishes a statutory basis for the operation and regulation of gaming by Indian tribes. *Seminole Tribe*, 517 U.S. at 48. Congress passed IGRA in response to *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that California lacked authority to regulate bingo gambling conducted by Indian tribes on Indian land within the state. *Id*. at 221–22. In response to the Court's decision, Congress, through IGRA, granted states a clear statutory role in the regulation of Indian gaming. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 720 n.11 (9th Cir. 2003); *see also* S.Rep. 100-446, at 6 (explaining that

the compact is intended to "provide a means by which tribal and State governments can realize their unique and individual governmental objectives [and] work together to develop a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied").

IGRA outlines three classes of gaming, each of which is regulated differently. Class I gaming consists of social games with prizes of minimal value. 25 U.S.C. § 2703(6). Class II includes bingo and certain non-banked card games. *Id*. § 2703(7)(A),(B). Class III gaming includes banked card games such as blackjack and baccarat, slot machines and other electronic gaming machines, and other Nevada-style gaming activities. *Id*. § 2710(b)(3)(B),(b)(8). States cannot regulate class I or class II gaming conducted by tribes, and tribes are free to operate both classes of gaming without a compact.[1]

However, unlike class I or class II gaming, IGRA grants states significant regulatory authority over class III gaming by (1) restricting class III gaming to tribal lands located in states that allow such gaming in some form; and (2) requiring class III gaming to be conducted in conformance with an agreement between the state and the tribe—a tribal-state compact. *Id.* § 2710(d)(1)(B),(C). Before class III gaming may be conducted under such a compact, the Secretary must either approve the compact or allow it to go into effect by not disapproving it within 45 days. *Id.* § 2710(d)(1)(C), (d)(3)(B), (d)(8)(C).

IGRA requires states to negotiate a tribal-state gaming compact in good faith. *Id.* § 2710(d)(7)(A). The statute provides that, if no agreement is reached after 180 days of negotiation, the tribe can bring an action in federal district court to challenge the state's alleged failure "to negotiate in good faith." *Id.* § 2710(d)(7)(B)(ii). If the court "finds that the State has

---

[1] A tribe may conduct class II gaming without state oversight if that state otherwise allows some form of class II gaming, even on a highly restricted basis. *Id.* § 2710(a)(2), (b)(1)(A), (b)(1)(B).

failed to negotiate in good faith with the Indian Tribe" to conclude a compact, IGRA's remedial process is triggered. *Id.* § 2710(d)(7)(B)(iii).

The first step in IGRA's remedial process is a court order requiring the state and the tribe to conclude a compact within sixty days. *Id.* § 2710(d)(7)(B)(iii). If the state and the tribe fail to conclude a compact within that time, the court must appoint a mediator, who shall select from proposed compacts submitted by the tribe and the state the one that best comports with IGRA. *Id.* § 2710(d)(7)(B)(iv), (v). If the state consents to the selected compact, it shall be treated as a tribal-state gaming compact. *Id.* § 2710(d)(7)(B)(vi). If the state does not consent to the proposed compact, the mediator must notify the Secretary, who shall then "prescribe, in consultation with the Indian Tribe, procedures—which [must be] consistent with the proposed compact selected by the mediator . . . , the provisions of [IGRA], and the relevant provisions of the laws of the State[.]" *Id.* § 2710(d)(7)(B)(vii).

**B.     Regulations to Establish Secretarial Procedures in Lieu of a Tribal-State Gaming Compact**

In 1996, the Supreme Court held that Congress lacked the power under the Indian Commerce Clause to abrogate state sovereign immunity confirmed by the Eleventh Amendment to the U.S. Constitution. *Seminole Tribe*, 517 U.S. 44. The Secretary then promulgated regulations to circumvent state sovereign immunity, and established a process for imposing Secretarial Procedures on states unless they waive their sovereign immunity to suits filed by tribes under 25 U.S.C. § 2710(d)(7)(B)(I). Class III Gaming Procedures, 64 Fed. Reg. 17,535 (Apr. 12, 1999) (codified at 25 C.F.R. pt. 291).

Under those regulations, a tribe is eligible for Secretarial Procedures if it can demonstrate that it requested compact negotiations, the state and the tribe did not come to agreement within 180 days, the tribe filed suit pursuant to 25 U.S.C. § 2710(d)(7)(B)(I), the state did not waive immunity from suit, and the court dismissed the case. 25 C.F.R. § 291.3. The regulations do not

require a determination that a state failed to negotiate in good faith, and a tribe seeking to invoke the regulations need not provide information related to that question. *See* Class III Gaming Procedures, 64 Fed. Reg. at 17,536 ("The final regulation eliminates the requirement that the Secretary make a finding on the 'good faith' issue.").

The regulations establish a process that requires the tribe to submit a complete proposal, including proposed gaming procedures. 25 C.F.R. § 291.4. The Secretary must solicit comment from the affected state regarding the tribe's proposal. *Id.* § 291.7. If the state does not respond to the Secretary's request for comment, the Secretary must review the tribe's proposal, determine whether it is consistent with IGRA and certain other requirements, and inform the tribe and the state of her decision to adopt the tribe's proposal or request an informal conference to resolve objections. *Id.* § 291.8. If the state offers an alternative proposal, the Secretary must appoint a mediator, but she can reject the proposal the mediator selects and prescribe "appropriate procedures" of her own devising. *Id.* §§ 291.9–291.11. Ultimately, unlike the statutory process, these rules give the Secretary broad discretion to issue procedures in the form and manner she desires.

## FACTUAL BACKGROUND

In early 2012, the Pueblo of Pojoaque requested compact negotiations with the State of New Mexico under N.M. Stat. Ann. § 11-13A-3(A). The Pueblo operates class III gaming under a "model" compact the State negotiated in 2001, which will expire on June 30, 2015. After many months of unsuccessful negotiations, the Pueblo filed a complaint under section 2710(d)(7) against the State alleging that the State had failed to conduct negotiations in good faith to achieve a renewed gaming compact. See COMPLAINT [FAILURE TO CONCLUDE COMPACT NEGOTIATIONS IN GOOD FAITH], Doc. No. 1, Case No. 1:13-cv-01186-JAPKBM (Dec. 13, 2013). The State requested dismissal of the Pueblo's claims based on its immunity from suit, and

the Court dismissed the case. *See* ORDER DISMISSING CASE, Doc. No. 22, Case No. 1:13-cv-01186-JAP-KBM (Mar. 3, 2014).

During the spring of 2014, the Pueblo asked the Secretary to initiate the process set forth in 25 C.F.R. Part 291 to develop Secretarial Procedures in lieu of the tribal-state compact IGRA requires. By letter dated June 17, 2014, the Secretary informed the State that the Pueblo was eligible for Secretarial Procedures and that the State had 60 days to comment on the Pueblo's proposed class III gaming procedures or to submit an alternative proposal to the Pueblo's proposed class III gaming procedures. *Id.*

The State filed suit against the Secretary on August 7, 2014, challenging the Secretary's authority to impose gaming procedures and asked the Court to enjoin the Secretary from implementing the Part 291 process. On September 11, 2014, the Court declined to issue a preliminary injunction, concluding that the State had not met "its demanding burden of showing a *substantial* likelihood of success on the merits." Mem. Op. and Order 19.

The State submitted comments and an alternative proposal to the Secretary on September 19, 2014. The State stated that it was participating under protest, and only after having exhausted all available means to stop the administrative proceedings. It also noted the Assistant Secretary's acknowledgment that the State would not waive any legal rights by providing comments.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Montrose, Colo.*, 754 F.3d 824, 831 (10th Cir. 2014).

**ARGUMENT**

**A.     This Court has jurisdiction to resolve this dispute.**

In its order denying a preliminary injunction, this Court correctly determined that it has jurisdiction over this action. Jurisdiction is conferred by 28 U.S.C. § 1331 and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the Article III requirements of standing and ripeness are satisfied.

Under 5 U.S.C. § 704, "final agency action for which there is no other adequate remedy in a court" is subject to judicial review.  As the Court has held, the Secretary's determination that the Pueblo is eligible for Secretarial Procedures is final agency action. Mem. Op. and Order 11–14. The Secretary's regulations provide that "[t]he Secretary's eligibility determination is final for the Department." 25 C.F.R. § 291.6(b); see 25 C.F.R. § 2.6(b) ("Decisions made by the Assistant Secretary—Indian Affairs shall be final for the Department . . . ."). That is consistent with the rule that final agency action occurs when an agency's action is more than "merely tentative" and is "one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks omitted). On the question whether the State enjoys immunity from being subjected to process at the behest of the Pueblo, the Secretary has reached a final decision, not a tentative one. That decision will allow the Pueblo to operate class III gaming without a tribal-state compact, and the Secretary has initiated proceedings to establish Secretarial Procedures, supplanting the mechanism Congress created to balance states' interests in regulating high-stakes gaming. Unless the Secretary's determination is set aside by this Court, it is one from which the legal consequence of denying the State's immunity and imposing procedures on the State will

inevitably flow. *Cf. Sackett v. EPA*, 132 S. Ct. 1367, 1371–72 (2012) (EPA compliance order was final agency action where it reflected findings that were not subject to further agency review).

The State has standing to bring this action. Article III requires the State to show that it is suffering an "injury in fact," that the injury is caused by the Secretary's actions challenged in this case, and that the injury is likely to be redressed by a favorable decision from the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The State is suffering three injuries as a result of the Secretary's action: (1) the Secretary's ongoing process is undermining its bargaining position in negotiations with other tribes; (2) it is suffering an injury to its sovereign dignity by having to submit to an administrative adjudication at the behest of the Pueblo; and (3) the Secretary is circumventing the State's statutory right to negotiate a compact. In ruling on the State's motion for a preliminary injunction, the Court correctly determined that the third of those injuries is sufficient to confer standing on the State. Mem. Op. and Order 10.[2] That injury is directly attributable to the Secretary's action, and it would be redressed by a favorable judgment.

This case is also ripe for adjudication. To determine if a case is ripe for adjudication, a court must evaluate (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). As the Secretary has conceded, the issues in this case are purely legal, and they are therefore fit for judicial resolution at this time. And as this Court explained in its ruling on the motion for a preliminary injunction, the Secretary's regulations "have a direct impact on New

---

[2] In its order, the Court concluded that the first two injuries are not sufficient for Article III standing. Mem. Op. and Order 7-9. The State respectfully disagrees with that conclusion, and it does not waive its argument that those injuries are also sufficient for standing. But in light of the Court's conclusion that the State has established one basis for standing, it is unnecessary to address the other bases for standing.

Mexico's position" in compact negotiations, and that impact is sufficiently immediate to make this case ripe. Mem. Op. and Order 16.

**B.     The Part 291 regulations exceed the explicit and carefully circumscribed authority Congress granted the Secretary and violate the remedial scheme Congress enacted.**

This Court's analysis of the Secretary's regulations is governed by *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). Under the first step of the *Chevron* inquiry, if "Congress has directly spoken to the precise question at issue . . ., that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. Only if the statute is ambiguous does a court proceed to the second step, asking whether the agency's interpretation is "based on a permissible construction of the statute." *Id.* at 843. IGRA is unambiguous not only about when gaming procedures can substitute for a negotiated gaming compact but also about the limited role the Secretary is authorized to play in the process—Congress left no gap to fill, nor did it provide any authorization to develop an alternative remedial process. Because the process set out in the Secretary's regulations is contrary to that provided by the statute, this Court should declare the Secretary's regulations invalid at the first step of the *Chevron* analysis. But if the Court does reach the second step of *Chevron*, it should conclude that the regulations represent an unreasonable interpretation of the statute.

**1.     IGRA's remedial provisions are unambiguous.**

a. In *Texas v. United States*, the Fifth Circuit correctly held that 25 C.F.R. Part 291 is invalid because it is contrary to the plain terms of IGRA. 497 F.3d 491, 511 (5th Cir. 2007). IGRA's remedial provisions are not ambiguous. To the contrary, they are unusually clear and detailed. IGRA prohibits a tribe from conducting class III gaming without a tribal-state compact. 25 U.S.C. § 2710(d)(1)(C). IGRA provides a single exception to that rule and includes remedial

provisions that apply only upon a judicial finding that a State has failed to negotiate in good faith. 25 U.S.C. § 2710(d)(7)(B)(iii). In the absence of such a finding, the action terminates and the Act provides no other recourse. If the court makes such a finding, then the court may order negotiation, then mediation. *Id.* § 2710(d)(7)(B)(iii), (iv). If mediation is necessary, it is the court that appoints a mediator, not the Secretary. *Id.* § 2710(d)(7)(B)(v). And if a state consents to the mediator's proposed compact, the mediator's proposal becomes the tribal-state compact. *Id.* § 2710(d)(7)(B)(vi). It is only when all of the procedural steps fail to produce the state's agreement that the statute authorizes the Secretary to prescribe procedures that bind the state, *id.* § 2710(d)(7)(B)(vii), and even then, those procedures must be "consistent with the [mediator's] proposed compact," *id.* § 2710(d)(7)(B)(vii)(I).

Congress did not grant the Secretary authority to prescribe procedures under any other circumstance, and such authority "may not be lightly presumed." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). That is why, as the Fifth Circuit explained, "[t]he plain language of IGRA permits limited secretarial intervention only as a last resort, and only after the statute's judicial remedial procedures have been exhausted." *Texas*, 497 F.3d at 501. "[T]he authoritative statement is the statutory text." *Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 568 (2005)). The Court must, therefore, begin with a statute's text. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).  If the text is unambiguous, as here, the Court "must apply the statute according to its terms." *Id.*

b. The Secretary suggests that the Supreme Court's decision in *Seminole Tribe* created a "gap" in the statute that she is authorized to fill. That is incorrect. The Tenth Circuit has explained that "[w]hen *Congress* leaves a gap within a statute administered by an agency, Congress impliedly entrusts the agency with authority to explain and fill in the interstices," and therefore "[j]udicial deference to administrative interpretations in these cases is not a policy choice, but rather a means of giving effect to congressional intent."  *Hernandez-Carrera v.*

*Carlson*, 547 F.3d 1237, 1246 (10th Cir. 2008) (emphasis supplied). Congress did not leave any gap: not even the Secretary suggests that IGRA, on its face, is ambiguous with respect to the procedures to be followed when a tribe objects to a state's conduct in negotiations.

And while the *Seminole Tribe* decision may have altered the way the statute operates in certain cases, that does not mean that unambiguous language becomes ambiguous by virtue of a subsequent decision. It is often the case that subsequent developments mean that a statute operates differently than when it was enacted. That may be a reason for Congress to amend the statute, but it is not a basis for either an agency or the courts to ignore the statute's unambiguous language. As the Supreme Court recently noted, "[o]ur unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding." *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004). That is because Congress is always free to amend a statute to address outcomes Congress does not approve.[3] *See e.g., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).

The Supreme Court applied that principle in *Seminole Tribe* itself. After the Court declared that Congress could not abrogate state sovereign immunity under the Indian Commerce Clause, the tribe sought to enforce the statutory duty to negotiate in good faith by means of an action against the governor under *Ex Parte Young*, 209 U.S. 123 (1908). The Court declined to allow such an action, noting that *Ex Parte Young* actions are inappropriate "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right[.]" 517 U.S. at 74. Crucially, the Court held that Section 2710(d)(7) provided just such a

---

[3] Congress frequently amends statutes to "correct" the Court's interpretations of various statutes. For example, Congress passed the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq*., in response to the Supreme Court's decision in *Employment Div., Dept. of Human Resources of Or. v. Smith*, 494 U.S. 872 (1990), which construed the Free Exercise Clause of the First Amendment to hold that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *See also,* Lilly Ledbetter Fair Pay Act of 2009, 123 Stat. 5, *superseding Ledbetter v. Goodyear Tire & Rubber Co*., 550 U.S. 618 (2007); Civil Rights Act of 1991, 105 Stat. 1071, *superseding in part, Lorance v. AT & T Technologies, Inc*., 490 U.S. 900 (1989); *Martin v. Wilks*, 490 U.S. 755 (1989); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989); and *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

scheme. "[T]he intricate procedures set forth in that provision," it said, "show that Congress intended therein not only to define, but also to limit significantly, the duty imposed by §2710(d)(3)." *Id.* The Court acknowledged, of course, that Congress lacked the authority to abrogate state sovereign immunity, but it deemed that fact irrelevant to the interpretation of the statute: "[T]he fact that Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young* strongly indicates that Congress had no wish to create the latter under § 2710(d)(3)." *Id.* at 75– 76. If an effort "to rewrite the statutory scheme" is to be made, the Court concluded, "it should be made by Congress." *Id.* at 76.

The Court's reasoning is controlling here. Even though Section 2710(d)(7) cannot establish jurisdiction over nonconsenting states, it still makes clear the limitations on the duty to negotiate that Congress imposed in Section 2710(d)(3). The Secretary's regulations disregard those limitations by replacing the remedial scheme that Congress enacted with a different scheme of the Secretary's devising. That, the Secretary cannot do: "It is one thing to fill a minor gap in a statute. . . . It is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *United States v. Jackson*, 390 U.S. 570, 580 (1968) (addressing an alternative sentencing scheme under a federal kidnapping statute designed to avoid constitutional limitations). If it is necessary to rewrite the statute in light of *Seminole Tribe*, the rewriting must be done by Congress, not the Secretary.

c. Dissenting in *Texas*, Judge Dennis argued that because "[t]he Supreme Court does not create law, it discovers it," any "ambiguity or gap in the IGRA was created by the Congress when it unintentionally chose and enacted a constitutionally ineffective tribal remedy, and not by the Court in the *Seminole* decision." 497 F.3d at 515. The Fifth Circuit correctly rejected that argument. As explained above, the decisive factor at *Chevron* step one is "the unambiguously

expressed intent of Congress," and a subsequent judicial decision has no bearing on that intent. *Chevron*, 467 U.S. at 843.

The hazards of Judge Dennis's approach are evident in the unsubstantiated assumptions he was required to make in order to find ambiguity where none exists. Despite the precisely defined remedial provisions in section 2710(d)(7), Judge Dennis declared that provision ambiguous because Congress "unintentionally chose and enacted a constitutionally ineffective tribal remedy," and through that "unintentional silence, create[d] a gap." *Texas*, 497 F.3d at 515–16. There is good reason to conclude that Congress knew exactly what it was doing when it enacted section 2710(d)(7) as the sole means of resolving disputes between tribes and states. Courts presume that "'Congress is aware of existing law when it passes legislation.'" *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 742 (2014) (quoting *Hall v. United States*, 566 U.S. ——,132 S.Ct. 1882, 1889 (2012)). And in 1988—the year Congress enacted IGRA—it was clearly "establish[ed] that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'" *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (quoting *Employees of Dept. of Public Health and Welfare, Mo. v. Department of Public Health and Welfare, Mo.*, 411 U.S. 279, 280 (1973)). As of 1988, the Court had upheld a congressional abrogation of Eleventh Amendment immunity in only one circumstance—when Congress enacted legislation to effectuate the provisions of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976) (holding that Eleventh Amendment immunity is limited by the Fourteenth Amendment, which "embod[ies] significant limitations on state authority"). Further, it has been clear for decades that state sovereign immunity is not limited to suits by individuals, but also applies when a state is sued by another sovereign. *See, e.g.*, *Principality of Monaco v. Mississippi*, 292 U.S. 313 (1934).

To be sure, the Court's decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), created confusion regarding Congress's power to abrogate state immunity under the Commerce

Clause. But the *Union Gas* decision (1) *postdates* IGRA's enactment by almost a year, (2) "proved to be a solitary departure from established law," and (3) was overruled by the Court in 1996. *See Seminole Tribe*, 517 U.S. at 60–66. Far from a sea change, *Seminole Tribe* actually reaffirmed the understanding of the Eleventh Amendment that prevailed at the time IGRA was passed: "It was well established *in 1989* when *Union Gas* was decided that the Eleventh Amendment stood for the constitutional principle that state sovereign immunity limited the federal courts' jurisdiction under Article III." *Id.* at 63 (emphasis supplied).

Because the Court must assume that Congress was aware of the law in 1988, Judge Dennis's suppositions about what Congress intended are purely speculative. Congress, for example, may well have thought that in cases where a state did not waive its immunity, the Secretary might sue on the tribe's behalf. *See Arizona v. California*, 460 U.S. 605, 614 (1983) (state may not assert sovereign immunity against the United States); *United States v. Minnesota*, 270 U.S. 181, 193–94 (1926) (holding that the United States has standing to sue on behalf of Indian tribes as guardians of the tribes' rights). In any event, the role of the courts is not to speculate as to what Congress might have been thinking, but rather to review the language Congress did actually enact to determine whether there is ambiguity. *Cf. Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1995) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Even if Judge Dennis were correct that Congress was unaware of the law in 1988, his conclusion would still be wrong. That is, even if Congress had enacted IGRA without any provision abrogating state sovereign immunity—rather than enacting the statute with such a provision that was later invalidated—IGRA still would not be ambiguous in a manner that permitted the Secretary to adopt the Part 291 regulations. Stripped of its provision abrogating sovereign immunity, IGRA imposes on states a duty to negotiate in good faith, and it provides a mechanism for enforcing that duty that is effective only when states choose to waive their

immunity. That the mechanism is not perfectly effective does not mean that the statute is ambiguous; it simply means that it reflects a balance of competing interests. *See Texas*, 497 F.3d at 491 ("In IGRA, Congress struck a finely-tuned balance between the interests of the states and the tribes[.]") (internal quotation marks omitted). There is no "gap" for the agency to fill.[4] The Supreme Court has held that when Congress establishes an enforcement scheme that gives a party "direct recourse to federal court," it is "inappropriate to consult executive interpretations of [the statute] to resolve ambiguities surrounding the scope of [the party's] judicially enforceable remedy." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990). *A fortiori*, an agency lacks discretion to create an entirely new enforcement scheme not contemplated by the statute. Rather, as Judge King observed, the creation of "an alternative remedial scheme that allows the Secretary to issue Class III gaming procedures without Congress's chosen prerequisites of a court determination of a state's bad faith and court-directed mediation goes beyond the mere effectuation of IGRA's provisions into the realm of wholesale statutory amendment." 497 U.S. at 512 (King, J., concurring) (citation omitted).

d. Even if the statute were ambiguous on its face, the regulations still would not survive the first step of *Chevron*. Instead, as the Supreme Court has explained, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council*, 485 U.S. 568, 575 (1988). In other words, the canon of constitutional avoidance is one

---

[4] Judge Dennis also argues that the Secretary has "broad rulemaking power," and that the Part 291 regulations should therefore be accorded deference. *See Texas*, 497 F.3d at 515 (citing *Morton v. Ruiz*, 415 U.S. 199, 231-32 (1974)). That argument, however, is inconsistent with the rulemaking authority Congress did expressly grant, which was to the National Indian Gaming Commission ("NIGC"), the regulatory body Congress created under the Act, not the Secretary. 25 U.S.C. § 2706(b)(10) (granting the NIGC authority to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of this chapter"). Such specific grants of rulemaking authority to NIGC trump the general authorities on which the Secretary relies, including 25 U.S.C. §§ 1a, 2 & 9. *See Gozlon–Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls one of more general application."). Even if there were a "gap" to be filled, it is the NIGC, not the Secretary, that should fill it.

of the "traditional tools of statutory construction" that courts apply in determining whether Congress has left a gap for the agency to fill. *Chevron*, 467 U.S. at 843 n.9. Here, the regulations are constitutionally defective for two independent reasons; at a minimum, they raise serious constitutional questions. Any interpretation of IGRA that permitted the regulations would similarly pose constitutional difficulties. To avoid those difficulties, this Court should construe the statute not to permit the Secretary's regulations.

First, the regulations directly violate the Eleventh Amendment. The Supreme Court recognized in *Seminole Tribe* that Congress could not abrogate a state's sovereign immunity to suit under IGRA at the behest of a tribe. 517 U.S. at 76. The same principles of sovereign immunity protect the State from this administrative proceeding. If Congress could not abrogate the State's sovereign immunity to determine whether the State failed to negotiate in good faith, the Secretary cannot apply the penalty that Congress devised.  In *Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743 (2002), the Court held that the Eleventh Amendment applies not only to adjudication in federal court but also to adjudication before an administrative agency. *Id.* at 768–69. As the Court explained, "if the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts, we cannot imagine that they would have found it acceptable to compel a State to do exactly the same thing before the administrative tribunal of an agency[.]" *Id.* at 760. If it is an impermissible affront to a State's dignity to be required to answer in federal court a tribal claim of bad faith negotiations, as the Court in *Seminole Tribe* determined, the Secretary's imposition of the penalties without such finding is an even greater affront.

Second, the regulations are invalid because even if Congress had the authority to compel states to submit to compulsory adjudication before the Secretary, it may not use the threat of such adjudication to coerce states into surrendering their Eleventh Amendment immunity from litigation in court. The Supreme Court has held that the decision to waive sovereign immunity

must be "altogether voluntary on the part of the sovereignty." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (quoting *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529 (1857)). For that reason, the Court held in *College Savings Bank* that Congress may not employ a theory of "constructive waiver" under which a state's immunity will be deemed "waived" if the state engages in specified conduct in a field subject to congressional regulation. 527 U.S. at 680. In reaching that conclusion, the Court looked to waiver principles applicable "in the context of *other* constitutionally protected privileges." *Id.* at 681. Specifically, drawing an analogy to the Court's cases involving conditional grants to states, the Court observed that "in cases involving conditions attached to federal funding, we have acknowledged that 'the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion.'" *Id.* at 687 (quoting *South Dakota v. Dole*, 483 U.S. 283, 211 (1987)). The Court concluded that "where the constitutionally guaranteed protection of the States' sovereign immunity is involved, the point of coercion is automatically passed—and the voluntariness of waiver destroyed—when what is attached to the refusal to waive is the exclusion of the State from otherwise lawful activity." *Id.*, 527 U.S. at 687. By determining that Secretarial Procedures under Part 291 are appropriate, the Secretary has denied New Mexico its statutory right to negotiate a compact with the Pueblo as an equal sovereign because it refused to waive its sovereign immunity. 134 Cong. Rec. S12643-01 (daily ed. Sept. 15, 1988) (statement of Sen. Inouye) (explaining that the compact requirement may "not be the best of all possible worlds but the committee believes that tribes and States can sit down at the negotiating table as equal sovereigns, each with contributions to offer and to receive").

As in *College Savings Bank*, the regulations at issue here have passed "the point of coercion" to induce a waiver of state sovereign immunity. The regulations were adopted with the express purpose of "respon[ding]" to *Seminole Tribe* by eliminating what the Secretary perceived

to be an undesirable "State veto over IGRA's dispute resolution system[.]" 64 Fed. Reg. 17,536

(1999). And they have the effect of coercing states into waiving immunity when sued by a tribe

under 25 U.S.C. § 2710(d)(7)(b). As explained above, if a state is sued under that provision—and

waives its immunity to allow the litigation to proceed—it will be subject to the imposition of

gaming procedures only if the court finds that the state has not negotiated in good faith, and even

then, the procedures will be chosen by a court-appointed mediator from one of the proposals

submitted by the parties. The Secretary's regulations, by contrast, do not provide those

protections. They allow the imposition of procedures without any finding of bad faith; they allow

the procedures to be imposed following a recommendation by a mediator who is chosen by the

Secretary, not by an Article III judge; and they do not restrict the procedures to the proposals of

the parties. If the regulations were valid, there would be no reason for a state *not* to waive its

immunity: a state is better off litigating under Section 2710(d)(7)(b), with the safeguards that that

provision guarantees, than placing itself at the mercy of the Secretary. The regulations are

therefore "properly viewed as a means of pressuring the States to accept policy changes"—

namely, waiving their sovereign immunity. *National Federation of Independent Business v.

Sebelius*, 132 S. Ct. 2566, 2604 (2012). Because the purpose and effect of the regulations is to

pressure the states into surrendering a constitutionally guaranteed prerogative, they are

unconstitutional.

      **2.**      **The regulations represent an unreasonable interpretation of the statute.**

      Even if the statute were ambiguous, the regulations would still be invalid because they

are not a reasonable interpretation of the statute. At *Chevron* step two, "the question for the court

is whether the agency's interpretation is based on a permissible construction of the statute in

light of its language, structure, and purpose." *Am. Fed'n of Labor & Cong. of Indus.

Organizations v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005) (internal quotation marks omitted).

Judges Jones and King both concluded that the Part 291 regulations are not a permissible construction of IGRA. *Compare Texas*, 497 F.3d at 508 (Jones, C.J.) ("The role the Secretary plays and the power he wields under the Procedures bear no resemblance to the secretarial power expressly delegated by Congress under IGRA.")*, with id.* at 508 (King, J., concurring in part) ("[T]he Secretary's method fails to preserve the core safeguards by which state interests are protected in Congress's 'carefully crafted and intricate remedial scheme.'") (citations omitted).

The regulations allowing for the imposition of Secretarial Procedures are directly contrary to the statute. Section 2710(d)(7) *requires* a finding that a state failed to negotiate in good faith before *any* further action is permitted. Under Part 291, however, there is no need for a judicial finding of bad faith. Instead, the Secretary effectively equates the State's assertion of sovereign immunity with bad faith. Part 291 is in fact more punitive than the process Congress enacted in the statute because the Secretary treats an assertion of sovereignty as an admission of guilt.  Nor is there any requirement of court-ordered mediation with a court-selected mediator. Instead, the tribe need only show that it has failed to reach an agreement with the state after 180 days of negotiations. 25 C.F.R. § 291.3. And while IGRA requires a court to order a state and tribe to conclude a compact in sixty days (upon a finding that a state failed to negotiate in good faith), 25 U.S.C. § 2710(d)(7)(B)(iii), the regulations include no such requirement. Under the regulations, the Secretary, not the court, appoints a mediator. *Compare* 25 C.F.R. § 291.9 *with* 25 U.S.C. § 2710(d)(7)(B)(iii). The Secretary may also reject the compact proposed by the mediator and agreed to by a state, 25 C.F.R. § 291.11(b), yet she has no such power under the Act, 25 U.S.C. § 2710(d)(7)(B)(vi). The regulations at once remove the safeguards afforded to states and purport to give the Secretary broader power and far greater discretion than permitted by the Act.

Moreover, under IGRA, a tribe can legally conduct class III gaming only pursuant to a tribal-state compact. Section 5 of the Johnson Act, 64 Stat. 1135, makes it unlawful "to manufacture, recondition, repair, sell, transport, possess, or use any gambling device . . . within

Indian country[.]" 15 U.S.C. § 1175. Penalties for violating the Johnson Act include fines and up to two years of imprisonment. *Id.* § 1176. IGRA exempts tribal gaming, only if the tribe has an extant compact with the state.  25 U.S.C. § 2710(d)(6) (The provisions of [the Johnson Act] shall not apply to any gaming conducted under a Tribal-State compact that—(A) is entered into under paragraph (3) by a State in which gambling devices are legal, and (B) is in effect.") The Part 291 regulations do not purport to result in a tribal-state compact, nor are the procedures "entered into under" section 2710(d)(3). Operating gambling devices under Part 291 would violate the Johnson Act.

The regulations undermine, rather than promote, one of the key purposes of IGRA— guaranteeing that gaming will be governed by compacts negotiated between states and tribes. Section 2710(d)(7)(B) is a narrow exception to the regime of freely negotiated compacts, and it is intended as a safeguard to protect tribes against recalcitrant states who negotiate in bad faith. The regulations, which require no finding of bad faith, turn the statute on its head by transforming that narrow exception into a mechanism that tribes can use to coerce even cooperative states. That is a fundamental alteration in the statutory scheme. For that reason, even if the language of section 2710(d)(7)(B) were ambiguous—which it is not—the Part 291 regulations are not a permissible reading of the statute.

## CONCLUSION

The Court should grant summary judgment in favor of the State to prevent it from further injury. Pursuant to 5 U.S.C. § 706, the State requests that the Court enter a permanent injunction barring the Secretary from enforcing 25 C.F.R. Part 291 against the State.

Date: September 29, 2014     Respectfully submitted,


         By: /s/ Jessica M. Hernandez
         GENERAL COUNSEL
         OFFICE OF THE GOVERNOR
         Jessica M. Hernandez
         Jeremiah L. Ritchie
         490 Old Santa Fe Trail, Suite #400
         Santa Fe, NM 87501-2704
         Telephone:  (505) 476-2200
         Facsimile:   (505) 476-2207

         Jennifer A. MacLean (Admitted *pro hac vice*)
         JMacLean@perkinscoie.com
         PERKINS COIE LLP
         700 Thirteenth Street, N.W., Suite 600
         Washington, D.C. 20005
         Phone: (202) 434-1648
         Fax: (202) 654-6211

         Eric D. Miller (Admitted *pro hac vice*)
         EMiller@perkinscoie.com
         PERKINS COIE LLP
         1201 Third Avenue, Suite 4900
         Seattle, WA 98101
         Phone: (206) 359-3773
         Fax: (206) 359-4773

         *Special Assistant Attorneys General*
         *The State of New Mexico*


The forgoing Motion was served electronically to all counsel of record via the CM/ECF system on September 29, 2014.


/s/ Jessica M. Hernandez
Jessica M. Hernandez