## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**STATE OF NEW MEXICO,**

      Plaintiff,

vs.                                                   No. 1:14-cv-00695-JAP/SCY

**DEPARTMENT OF THE INTERIOR**
and **SALLY JEWELL**, in her official
capacity as Secretary of the Interior,

      Defendants,

      and

**PUEBLO OF POJOAQUE**, a federally-
recognized Indian Tribe,

      Intervenor Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff State of New Mexico challenges the Department of the Interior and the Secretary of the Interior's legal authority to implement regulations found in 25 C.F.R. § 291 ("Secretarial Procedures" or "Part 291 regulations"). The Secretarial Procedures, if adopted, would allow the Pueblo of Pojoaque to conduct Class III gaming on its reservation. New Mexico asks this Court to declare the Secretarial Procedures invalid because they conflict with the unambiguous terms of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*. and violate New Mexico's sovereign immunity under the Eleventh Amendment.

Before this Court are the parties' cross-motions for summary judgment, filed on September 29, 2014: New Mexico's MOTION FOR SUMMARY JUDGMENT (New Mexico's Motion for Summary Judgment) (Doc. No. 39); Defendants Department of the Interior and Sally Jewell's MOTION FOR SUMMARY JUDGMENT (Defendants' Motion for Summary

Judgment) (Doc. No. 37), and Intervenor Defendant Pueblo of Pojoaque's JOINDER AND

MEMORANDUM IN SUPPORT OF DEFENDANT'S [sic] MOTION FOR SUMMARY

JUDGMENT ("Pueblo's Motion") (Doc. No. 38). The parties filed their responses on October 6,

2014. *See* Doc. Nos. 40 (Pueblo's Response), 41 (New Mexico's Response), 42 (Defendants'

Response). The parties filed their replies on October 14, 2014. *See* Doc Nos. 43 (Pueblo's

Reply), 44 (Defendants' Reply), 46 (New Mexico's Reply).[1]

The Court will outline the facts and procedural history that led to the Parties' cross-

motions for summary judgment. It will then address Defendants' arguments that this Court lacks

jurisdiction to hear New Mexico's claims. Because the Court concludes it has jurisdiction to hear

New Mexico's claims, the final part of this Memorandum Opinion and Order will address

whether Defendants have the legal authority to enforce the Part 291 regulations.

## BACKGROUND

**a. The passage of IGRA and the United States Supreme Court's invalidation of its
jurisdiction-granting clause**

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the United

States Supreme Court held that absent Congressional authorization, States could not regulate or

prohibit Indian tribes' on-reservation gambling activities. *Id.* at 207–210. IGRA is a

comprehensive statutory scheme that governs tribes' ability to conduct on-reservation gambling

activities that Congress passed in response to *Cabazon*. One of IGRA's most important

provisions gives States a role in regulating tribes' Class III gaming activities, which include

lucrative slot machines and banked card games like blackjack. 25 U.S.C. § 2703(8). If a Tribe

---

[1] Since the Pueblo of Pojoaque joins in the Department of the Interior's motion, this Court will not distinguish
among Defendants unless necessary. The Court will likewise treat the Secretary of the Interior and the Department
of the Interior interchangeably, even though IGRA vests the Secretary, not the Department, with the regulatory
authority at issue in this case.

wishes to engage in Class III gaming activities, IGRA requires the Tribe to negotiate a binding compact with the State. 25 U.S.C. § 2710(d)(1)(C). It is worth noting that IGRA's compact requirement gives States a right to influence tribal gaming that States would otherwise not be afforded by the U.S. Constitution. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996).

In exchange for a seat at the poker table, IGRA requires States to negotiate Class III gaming compacts in "good faith." 25 U.S.C. § 2710(d)(3). IGRA's remedial process begins when a Tribe formally asks the State to enter into negotiations over a gaming compact. 25 U.S.C. § 2710(d)(3)(A). IGRA sets out the permissible areas of negotiation. 25 U.S.C. § 2710(d)(3)(C). If the parties agree to a compact, that is more or less the end of the matter; all that remains is for the Secretary of the Interior to review and approve the compact. *Id.* § 2710(d)(3)(B).

But what if a State refuses to put in its good-faith ante? In that case, the Tribe may bring suit against the State in federal district court. 25 U.S.C. § 2710(d)(7). If the court finds the State acted in bad faith, it can then order the State and the Tribe to execute a compact within sixty days. 25 U.S.C. § 2710(d)(7)(B)(iii). If the State keeps dragging its heels, the court may then order the parties to enter mediation. 25 U.S.C. § 2710(d)(7)(B)(iv). Under the mediation process, the State and the Tribe each submit their most recent "last best offer" for a compact to a court-appointed mediator. *Id.* The mediator then selects whichever proposal most comports with IGRA, the court's order and findings, and other applicable federal law. *Id.*

After all this, the State has one last opportunity to either accept or reject the mediator's proposal. 25 U.S.C. § 2710(d)(7)(B)(v)–(vii). If the State refuses the proposal,  IGRA allows the Secretary of the Interior to call the State's bluff and adopt procedures allowing the Tribe to

conduct Class III gaming under rules similar to the mediator's proposal but without a compact with the State. 25 U.S.C. § 2710(d)(7)(B)(vii).[2]

The United States Supreme Court threw IGRA's remedial scheme into disarray with its decision in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1994). In *Seminole Tribe*, the Supreme Court held that Congress had no authority under the Indian Commerce Clause, U.S. Const. art. I § 8, cl. 3, to subject States to suits filed by Indian tribes seeking a declaration of bad faith failure to negotiate a Class III gaming compact. *Id.* at 47. *Seminole Tribe* seriously weakened Indian tribes' bargaining power under IGRA, because it made unobtainable Tribes' sole remedy for States' bad faith. *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1299 (9th Cir. 1998).

### b.  The Secretarial Procedures

Under IGRA, the Secretary of the Interior has authority to implement regulations allowing a Tribe to conduct Class III gaming activities without a tribal-state compact, but only at the very end of IGRA's remedial process (i.e., after a court finds the state has failed to negotiate in good faith and mediation has concluded). 25 U.S.C. § 2710(d)(7)(B)(vii)(II). To preserve IGRA's remedial scheme and to mitigate the effects of *Seminole Tribe*, the Secretary of the Interior adopted regulations which roughly imitate the process that would have taken place had the State not used its sovereign immunity to cause dismissal of the Tribe's bad faith claim in

---

[2] The Secretary's role is not limited to implementing procedures after the Tribe's negotiations with the State have utterly failed. IGRA allows the Secretary, for example, to disapprove of an agreed-to compact if it violates the United States' trust obligations to the Tribe. 25 U.S.C. § 2710(d)(8)(B)(iii).

federal court.[3] The regulations provide that when, as here, "[a] State and an Indian tribe are unable to voluntarily agree to a compact" and "[t]he State has asserted its immunity from suit brought by an Indian tribe under 25 U.S.C. § 2710(d)(7)(B)," 25 C.F.R. § 291.1 (1999), an Indian tribe may apply for Secretarial Procedures to operate Class III gaming without a compact with the State.

If the State invokes its sovereign immunity and the Tribe's bad faith case against the State is dismissed, the Tribe may submit a proposal to the Secretary of the Interior containing detailed information about the Tribe's proposed gaming procedures. 25 C.F.R. § 291.4 (1999). This includes records of the Tribe's past negotiations with the State and a proposed "[r]egulatory scheme for the State's oversight role, if any, in monitoring and enforcing compliance." *Id.* After the Department verifies that the Tribe's negotiations with the State have failed and that the State successfully obtained dismissal of the Tribe's bad faith lawsuit by invoking the State's sovereign immunity, the Secretary issues a "final" determination that the Tribe is eligible for the Secretarial Procedures. 25 C.F.R. § 291.6 (1999). Once this eligibility determination is made, the Department solicits comments from the State. 25 C.F.R. § 291.7 (1999). The State may comment on the Tribe's proposal and even propose its own. *Id.*

---

[3] This case touches on the Executive Branch's authority to adopt regulations in furtherance of Congress's original intent by mitigating the effect of intervening United States Supreme Court decisions. *See, e.g.*, *Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004) (considering the validity of regulations adopted in the wake of a United States Supreme Court case finding a statute unconstitutional). Whether or not the regulations at issue in this case are valid, the Court notes the conspicuous absence of any Congressional intervention to remedy the effects of *Seminole Tribe*. Time and again Congress has responded when the Supreme Court has held a statute unconstitutional. *See, e.g.*, *Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990), *superseded by statute*, Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488. *See also City of Boerne v. Flores*, 521 U.S. 507 (1997) (holding RFRA unconstitutional as applied to States). Reacting to *City of Boerne*, Congress passed the Religious Land Use and Institutionalized Persons Act, Pub.L. 106–274 (2000), which re-imposes many of RFRA's requirements on States through Congress's spending clause power under U.S. Const. art. 1, § 8, cl. 1. These cases and Congress's reaction to them show that it is Congress, not the Executive or the Judiciary, that is best equipped to say how the law should change after the Supreme Court invalidates a statute.

If the State refuses to submit comments or an alternative proposal, the Secretary

independently determines whether the Tribe's proposal meets the following requirements:

> (1) Whether all requirements of [25 C.F.R.] § 291.4 [i.e., the initial
>     procedures eligibility determination] are adequately addressed;
> (2) Whether Class III gaming activities will be conducted on Indian
>     lands over which the Indian tribe has jurisdiction;
> (3) Whether contemplated gaming activities are permitted in the State
>     for any purposes by any person, organization, or entity;
> (4) Whether the proposal is consistent with relevant provisions of the
>     laws of the State;
> (5) Whether the proposal is consistent with the trust obligations of the
>     United States to the Indian tribe;
> (6) Whether the proposal is consistent with all applicable provisions of
>     IGRA; and
> (7) Whether the proposal is consistent with provisions of other
>     applicable Federal laws.

25 C.F.R. § 291.8 (1999). At this point, the Department may approve or disapprove of the

Tribe's proposal. 25 C.F.R. § 291.8(b)–(c) (1999).

If the State makes an alternate proposal, the Secretary must appoint a mediator with "no

official, financial, or personal conflict of interest with respect to the issues in controversy" who

then seeks to "resolve differences between the two proposals." 25 C.F.R. § 291.9 (1999). After

hearing evidence and argument from both sides, the mediator selects the proposal that "best

comports with the terms of IGRA and any other applicable Federal law." 25 C.F.R. § 291.10

(1999).

After the mediator selects a proposal, the Secretary has 60 days to either approve or

disapprove of the selected proposal. 25 C.F.R. § 291.11 (1999). The regulations outline a discrete

set of permissible grounds for denying the mediator's selected proposal. If the Secretary rejects

the mediator's proposal, it must nonetheless approve of procedures for the conduct of Class III

gaming, taking into account the mediator's proposal, IGRA, and relevant state law. *Id.*

In sum, the Secretarial Procedures prevent tribal gaming from becoming a compact-or-nothing prospect after *Seminole Tribe* by making IGRA's river card, regulations allowing gaming without a compact, available to a Tribe on the flop, before a federal court has ruled on the Tribe's allegations of bad faith. Of course, New Mexico does not like this turn of events: if valid, the regulations prevent New Mexico from using its Eleventh Amendment sovereign immunity as a trump card to force Tribes to negotiate on New Mexico's terms or not conduct gaming at all.

Only one court of appeals has addressed the Secretarial Procedures' validity. In *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), the Court of Appeals for the Fifth Circuit held that the Secretarial Procedures were contrary to the plain language of IGRA. *Id.* at 500–505. The *Texas* court also concluded that Texas had standing to challenge the Secretarial Procedures and that its challenge to the procedures was ripe for judicial review. *Id.* at 496–499. But the persuasive value of *Texas* is diminished by the fact that only one judge (Chief Judge Jones) on the three-judge panel concluded that IGRA was unambiguous. Judge King concurred in the result, but thought IGRA was ambiguous and therefore subject to reasonable agency interpretation. *Id.* at 511–512 (King, J., concurring in part and in the judgment). Judge Dennis, dissenting from the panel's decision, "pretermit[ed] the serious standing and ripeness issues" in the case and instead concluded that IGRA was ambiguous and that the Part 291 regulations were a reasonable resolution of these ambiguities. *Id.* at 513–514 (Dennis, J., dissenting).

*Texas* provides helpful legal reasoning directly relevant to the Court's review of New Mexico's challenge. But the conflicts among the judges on the panel limit the persuasive value of *Texas*. While this court strives to avoid conflicts with sister circuits, it has an "obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme

Court, and for the district courts within a circuit, only by the court of appeals for that circuit." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsburg, J.), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

## PROCEDURAL HISTORY AND UNDISPUTED FACTS

The procedural history of this case is detailed in this Court's September 11, 2014 MEMORANDUM OPINION AND ORDER (Doc. No. 31) denying New Mexico's request for a preliminary injunction. The following brief summary of undisputed facts controls the Court's disposition of the parties' cross-motions for summary judgment:

(1) More than 180 days after the Pueblo of Pojoaque asked New Mexico to negotiate a renewed Class III gaming compact, the Pueblo brought suit under IGRA on December 13, 2013, seeking a declaration that New Mexico had breached its obligation to negotiate in good faith. *See* COMPLAINT [FAILURE TO CONCLUDE COMPACT NEGOTIATIONS IN GOOD FAITH], Doc. No. 1, 1:13-cv-01186-JAP-KBM (Dec. 13, 2013).

(2) On March 3, 2014, the Pueblo's claim was dismissed after New Mexico asserted its Eleventh Amendment immunity from suit. *See* ORDER DISMISSING CASE, Doc. No. 22, Case No. 1:13-cv-01186-JAP-KBM (Mar. 3, 2014).

(3) On May 9, 2014, the Pueblo of Pojoaque petitioned the Secretary of the Interior for a determination that it was eligible to conduct gaming under 25 C.F.R. § 291 *et seq*. Doc. No. 13-1.

(4) On June 17, 2014, the Department of Interior notified New Mexico it had determined the Pueblo of Pojoaque was eligible for procedures and solicited comments or an alternative gaming proposal to the Secretary. Doc. No. 13-2.

(5) Under protest, New Mexico has commented on the Pueblo of Pojoaque's proposed

gaming procedures and has submitted an alternate proposal to the Secretary.

Defendants' Motion for Summary Judgment at 3–4.

## JURISDICTION

Defendants insist that this Court does not have subject matter jurisdiction to consider New Mexico's claims. Defendants assert (1) New Mexico cannot show Article III standing; (2) at this stage in the administrative process, there is no final agency action for New Mexico to contest; and (3) New Mexico's challenge to the Secretarial Procedures is not ripe for judicial review. The Court will address these arguments in turn.

### a.  New Mexico has Article III standing

In order to meet Article III's standing requirement, New Mexico must make three showings: (1) injury in fact; (2) causation; and (3) redressibility. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An "injury in fact" is an invasion of a "legally protected interest" that is "concrete and particularized, not conjectural or hypothetical." *Id.* (quotations omitted). "Causation" consists of showing that the injury asserted is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal alterations and quotation omitted). "Redressibility" means a favorable decision will likely redress the claimed harm. *Id.* at 561.

The party invoking federal jurisdiction must show "by affidavit or other evidence specific facts…which for purposes of the summary judgment motion will be taken to be true" that establish Article III standing. *Id.* Normally, a plaintiff must show that he is "himself an object of the action (or forgone action) at issue" when he seeks to challenge "the legality of government action or inaction[.]" *Id.*

The Department of the Interior and the Secretary of the Interior concede New Mexico would have standing to challenge the legality of the procedures once they are implemented, because at that point the procedures would give the Pueblo of Pojoaque legal authority to conduct Class III gambling without a valid compact with New Mexico and without a federal court ruling on the Pueblo of Pojoaque's allegations of bad faith. Defendants' Motion for Summary Judgment at 16.

Defendants argue that until procedures have been formally adopted (i.e., published in the Federal Register), New Mexico has suffered only two injuries: (1) the Pueblo of Pojoaque is no longer required to negotiate a compact with New Mexico as the sole means of gaining the legal authority to engage in Class III gaming activities; and (2) the Pueblo of Pojoaque is no longer required to obtain a declaration from a federal court that New Mexico has breached its obligation to negotiate in good faith in order to obtain Secretarial Procedures. Defendants' Motion for Summary Judgment at 16–17.

Defendants contend New Mexico cannot show the injuries are caused by the Secretary's eligibility determination because they stem from New Mexico's own conduct: namely, its decision to invoke its sovereign immunity to block the Pueblo of Pojoaque's bad faith lawsuit. They cite two cases in support of this argument: *Pennsylvania v. New Jersey*, 426 U.S. 660 (1974) and *Brotherhood of Locomotive Eng'rs and Trainmen v. Surface Transp. Bd.*, 457 F.3d 24 (D.C. Cir. 2006).

In *Pennsylvania*, the United States Supreme Court held that Pennsylvania lacked standing to challenge New Jersey's tax on non-residents' New Jersey-derived income because Pennsylvania had passed a law giving its citizens a tax credit to offset the New Jersey tax. *Pennsylvania*, 426 U.S. at 662–64. In *Brotherhood of Locomotive Eng'rs and Trainmen*, the

union plaintiff challenged a rail transfer as illegal under federal law. *Brotherhood*, 457 F. 3d at

28. The Court of Appeals for the District of Columbia Circuit held that the union lacked standing

to challenge the transfer, because the union had bargained away its right to challenge such a

transfer in a collective bargaining agreement with the defendant. *Id.*

New Mexico makes two responses. First, New Mexico says Defendants' concession that

New Mexico would have standing after the publication of the Pueblo's gaming procedures in the

Federal Register leaves no room to argue New Mexico has no standing right now. New Mexico's

Response at 8. Second, New Mexico argues that its assertion of sovereign immunity is not an

intervening cause that breaks the link between its claimed injuries and the Secretary's eligibility

determination; rather, it is an essential prerequisite to the Secretary's ability to make such a

determination in the first place. *Id.* at 9 (citing 25 C.F.R. § 291.3, 291.6(b) (1999)).

In *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007), the Fifth Circuit Court of

Appeals held that Texas had standing to challenge the Part 291 regulations' validity because the

Secretarial Procedures "subjected" Texas to an "administrative process involving mediation and

secretarial approval of gaming procedures even though no court has found that Texas negotiated

in bad faith." *Id.* at 497. In other words, the *Texas* court concluded that the Secretarial

Procedures injured Texas by assuming the truth of Texas's argument that the Secretarial

Procedures compelled it to participate in an illegal remedial process. *Id.*

The Fifth Circuit in *Texas* relied on *Thomas v. Union Carbide Agric. Prods. Co.*, 473

U.S. 568, 582 (1985). The Supreme Court in *Thomas* held that forced adjudication of a claim for

compensation under the Fifth Amendment before an arbitrator instead of an Article III judge was

a concrete injury conferring Article III standing because the statute's unconstitutional assignment

of jurisdiction over the party to an arbitrator was itself an injury. *Thomas*, 473 U.S. at 580.

But this Court believes that, unlike the arbitration proceeding in *Thomas*, the Part 291 regulations do not subject New Mexico to any sort of jurisdiction—lawful or unlawful. The Secretarial Procedures do not assert jurisdiction over New Mexico–that is, the power to create an enforceable resolution of the conflict between New Mexico and the Pueblo over New Mexico's failure to negotiate in good faith. Rather, the Secretarial Procedures are the Secretary's effort to exercise her statutory power to institute Class III procedures without a State's consent under IGRA. New Mexico does not challenge the Secretary's constitutional or even statutory authority to adopt such regulations; rather, it challenges the Secretary's authority to do so in the absence of the statutory predicate of a finding of bad faith.

But this Court need not find the Part 291 regulations jurisdictional in order to find New Mexico has standing to pursue its challenge. Rather, it need only determine that New Mexico has suffered an injury to a "cognizable interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992). The Court concludes that New Mexico has two cognizable interests under IGRA: (1) preventing mediation between it and the Pueblo of Pojoaque without a federal court first finding New Mexico breached its obligation to negotiate in good faith, and (2) ensuring that the only way Class III gaming takes place on the Pueblo of Pojoaque's lands is under a negotiated gaming compact. *See* 25 U.S.C. § 2710(d)(1)(C) ("Class III gaming activities shall be lawful on Indian lands only if such activities are conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State[.]").

*Lujan* provides a useful example. The Supreme Court in that case did not require the plaintiffs to show that they would prevail on the merits in order to demonstrate standing; instead, the Court focused on whether the evidence in the record established an injury to a cognizable interest and that the plaintiffs were an object of the complained-of actions. *See Lujan*, 504 U.S. at

563 ("the injury in fact test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." (quotation omitted)). In *Lujan*, the plaintiffs sued to force the United States to solicit consultation on government-funded projects outside the United States that the plaintiffs alleged threatened species listed on the Endangered Species Act. *Id.* at 562. The Plaintiffs' assertions of standing, however, were based on past trips abroad to observe the species in question and a present intent to make similar trips in the future. *Id.* at 563. The Court held that there was no indication that the alleged damage to endangered species would cause any cognizable injury to the plaintiffs because an intent to return "some day" was insufficiently concrete. *Id.* at 564.

Here, there is a direct link between Defendants' eligibility determination and the interests New Mexico claims the Secretarial Procedures harm. The Secretarial Procedures allow the Pueblo of Pojoaque to avail itself of IGRA's final remedy—the authority to conduct Class III gaming in the absence of a compact with New Mexico—without obtaining a declaration of bad faith from a federal court. The conduct New Mexico challenges—the Secretary's decision to allow Tribes to seek gaming procedures prior to a federal court determination of bad faith—is intimately connected with the harm to New Mexico's statutory interests under IGRA if the Secretary of the Interior adopts regulations permitting the Pueblo to conduct Class III gaming activities.

*Pennsylvania* and *Brotherhood of Locomotive Eng'rs and Trainmen* are distinguishable for the same reason. In those cases, the complained-of injury was traceable not to the defendant's conduct but to the plaintiff's affirmative decision to either waive its right to challenge such conduct or mitigate the harm it caused by taking actions it was not legally required to do. Here, New Mexico has done neither: it has studiously preserved its right to challenge the Secretarial

Procedures by only engaging in informal discussions with the Secretary and the Pueblo of Pojoaque "under protest." Nor has it mitigated the Secretarial Procedures' effects by invoking its sovereign immunity; instead, as New Mexico points out, invoking its sovereign immunity is a prerequisite to the procedures' application.

The Court concludes that New Mexico has suffered a concrete injury to its statutory interests under IGRA, an injury fairly traceable to Defendants' eligibility determination. Moreover, this injury would be adequately redressed by a favorable decision from this Court.[4]

**b.   The Secretary's eligibility determination is a final agency action**

The Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, allows judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Unless there is a final agency action, there is no applicable waiver of the United States' immunity from suit. 5 U.S.C. § 702. The APA defers judicial review of a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable" until there is a final agency action. *Id.* Agency action is "final" if it (1) marks "the consummation of the agency's decisionmaking process," and (2) determines rights, obligations, or legal consequences. *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

Title 25 C.F.R. § 291.6(b) states that the Secretary's eligibility determination is "final." But Defendants say the Secretary's eligibility determination, "pragmatically viewed," is not the consummation of the decisionmaking process because it does not give the Pueblo of Pojoaque the fixed legal authority to conduct Class III gaming. Defendants' Motion for Summary Judgment at 11. Defendants also argue that the eligibility determination does not determine

---

[4] New Mexico argues its bargaining position relative to the Pueblo of Pojoaque and other tribes, its "dignity" as a state, and the economic costs of participating in the Secretarial Procedures are also interests sufficient to confer standing. The Court rejects those arguments for the reasons stated in its Order denying New Mexico's request for a preliminary injunction. *See* Doc. No. 31 at 8.

rights, obligations or legal consequences because (1) the Part 291 regulations do not <u>require</u> the Secretary to issue gaming procedures once she makes an eligibility determination; and (2) New Mexico and the Pueblo of Pojoaque might negotiate and agree to a gaming compact before gaming procedures are issued, thereby terminating the process before its culmination. *Id.* at 11–12.

While the Secretary is not obliged to issue procedures after the eligibility determination, she is required to do so within sixty days of making the determination. 25 C.F.R. § 291.8–9 (1999). Under the regulations, the sixty-day deadline passed on August 16, 2014. And while the Secretary extended this deadline in order to allow New Mexico to submit an alternate proposal, the regulations do not give the Secretary discretion to refuse to issue gaming procedures once the State has submitted a proposal; instead, the Secretary must appoint a mediator. 25 C.F.R. § 291.9 (1999). Once a mediator has been appointed and sends a proposal to the Secretary, the Secretary <u>must</u> issue gaming procedures. 25 C.F.R. § 291.11(c) (1999).

*Dalton v. Specter*, 511 U.S. 462 (1994), is instructive. There, the United States Supreme Court found Department of Defense recommendations for base closures were not final agency actions because they were in no sense binding on the President, who retained absolute discretion to accept or reject the Department of Defense's recommendations. *Id.* at 469–471.

Unlike the Department of Defense's recommendations that were still subject to the President's absolutely discretionary approval in *Dalton*, the Part 291 regulations now <u>require</u> the Secretary to adopt procedures in some form. Initially, the Secretary of the Interior retained the

ability to deny a Tribe's request for procedures. But once New Mexico submitted an alternate proposal, that leeway disappeared.[5]

Defendants next argue that the Secretarial Procedures are not yet final because New Mexico might agree to a compact with the Pueblo of Pojoaque. This would render Secretarial Procedures unnecessary. There are two flaws with this argument. First, as New Mexico points out, a settlement is possible in any legal battle. New Mexico's Response at 4. Absent some other fact showing that an agency's action is tentative or interlocutory, the possibility of a settlement rendering agency action unnecessary has no bearing on the finality analysis. Second, Defendants have essentially turned the Part 291 regulations into a means of encouraging New Mexico to settle with the Tribe. *See* Declaration of Ass't Secretary for Indian Affairs Kevin Washburn, Doc. No. 19-2 at 4. If the possibility of a settlement precluded judicial review, then the Secretary of the Interior could delay implementation to undermine New Mexico's legal challenge while at the same time using the possibility of adoption as a spur to force New Mexico into a compact with terms it otherwise would not have agreed to.

In sum, the eligibility determination is an action that will "directly affect" New Mexico, determining rights, obligations, and legal consequences. *Dalton*, 511 U.S. at 469. For the same reason, the Secretary's eligibility determination marks the consummation of the agency action New Mexico challenges.[6] The Secretary's eligibility determination is therefore a final agency action subject to review in this Court. 5 U.S.C. §§ 702, 704.

---

[5] At a hearing on New Mexico's motion for a preliminary injunction, the Department of the Interior did not contest this Court's suggestion that unless New Mexico enters a compact with the Pueblo of Pojoaque, the Department of the Interior would almost certainly issue procedures allowing the Pueblo to continue Class III gaming activities.

[6] While the exact format of the procedures is yet to be determined, New Mexico does not challenge this arguably "tentative or interlocutory" aspect of the Secretarial Procedures. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Rather, it challenges the Secretary's authority to issue procedures in the first place.

### c.   New Mexico's challenge is ripe for judicial review

Ripeness is a doctrine of justiciability which "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149 (1967). Ripeness is "best seen in a twofold aspect, requiring [courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id. See also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Courts use a number of factors to balance an issue's fitness for determination against the hardship caused by exercising prudential refusal to adjudicate a claim. Relevant to this case, a challenge to agency regulation is ripe for judicial determination if the plaintiff's challenge presents "purely legal" questions, the complained-of regulation is a final agency action, and additional facts would not "significantly advance [the court's] ability to deal with the legal issues presented." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003). The following factors are also to be weighed: (1) whether the action has or will have a "direct and immediate impact" on the plaintiff and (2) whether the resolution of the plaintiff's claims will "promote effective enforcement and administration by the agency." *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001) (quoting *HRI, Inc. v. EPA*, 198 F.3d 1224, 1235–36 (10th Cir. 2000)).

Defendants do not dispute that New Mexico's challenge to the Secretarial Procedures raises purely legal questions.[7] Instead, they contend the Secretary's eligibility determination was not a "final agency action" under the APA, 5 U.S.C. § 704, and the Procedures cause no "direct and immediate impact" on New Mexico. The Court has already concluded the challenged action is final for purposes of judicial review under the APA, so the only remaining questions are whether the Secretary's eligibility determination has a direct and immediate impact on New Mexico and whether ruling on New Mexico's claim will further the Department of the Interior's effective enforcement of IGRA.

Defendants argue that the Secretary's eligibility determination has no impact on New Mexico because it does not affect New Mexico's "primary conduct." Defendants' Motion for Summary Judgment at 15 (quoting *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967)). Defendants assert that any impact on New Mexico stems not from the eligibility determination itself but from the eventual adoption of procedures, which is a "contingent future event[] that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted). Any current impact, Defendants argue, stems entirely from "mere uncertainty as to the validity of a legal rule," which cannot qualify as a "hardship for purposes of the ripeness analysis." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003).

---

[7] Defendants, in their Reply, state that New Mexico has raised non-legal questions by alleging that the Secretary, as the Pueblo's trustee, would be unable to appoint a neutral mediator, as the § 291 regulations require. *See* Doc. No. 44 at 6 (quoting New Mexico's Response at 20). New Mexico waived that argument when it asked this Court to review the validity of the Part 291 regulations in light of the Secretary's eligibility determination, and not the procedures ultimately adopted under those regulations. New Mexico explicitly disclaimed any argument that the Secretary was biased or had acted arbitrarily or capriciously in order to minimize any concerns that its challenge was not ripe for judicial review. *See* MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION TO STAY ADMINISTRATIVE PROCEEDINGS (Doc. No. 13) at 16. Any argument that the Secretary is biased in favor of the Pueblo of Pojoaque has no bearing on this Court's decision.

The "contingent future event" Defendants refer to is the possibility that New Mexico and the Pueblo of Pojoaque will agree to a binding compact, obviating the need for the Secretary to adopt gaming procedures.[8] In a declaration by Paula Hart, the Director of the Office of Indian Gaming at the United States Department of the Interior, Doc. No. 37-1 ("Hart Declaration"), Ms. Hart states that the Department of the Interior has received seven applications for gaming procedures, but has yet to implement any gaming procedures. Hart Declaration at 1. Two of those applications were mooted by the Fifth Circuit as a result of its decision invalidating the Secretarial Procedures in *Texas v. United States*, 497 F.3d 491 (5th Cir. 2007). Hart Declaration at 1. Two of the applications were mooted because the Tribe struck a gaming compact with the state, one was denied, and two have "been placed on hold." *Id.*

These statistics means one of two possible things. They could mean that the Part 291 regulations' process itself is so fraught with uncertainty that a judicial decision at this point would require entanglement with "abstract disagreements over administrative policies…[before] an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148–149 (1967).

Or they could mean that the Part 291 regulations are working exactly as designed—that is, encouraging States to compact with Tribes where before they were not. *See* Declaration of Ass't Secretary for Indian Affairs Kevin Washburn, Doc. No. 19-2 at 3 ("It is the Department's strong preference that the State and the Pueblo [of Pojoaque] reach agreement on a compact amendment[.]"). This is a more plausible explanation. The Part 291 regulations may only be utilized after a Tribe's negotiations with a State have broken down and the State has used its

---

[8] This Court has already concluded that the mere possibility of settlement cannot have any bearing on this Court's analysis of whether the Secretary's eligibility determination is a final agency action. The reason behind this conclusion—that the possibility of settlement exists in almost every case—applies with equal force in the context of determining ripeness.

immunity from suit to prevent a Tribe from seeking a bad faith declaration from a federal court. 25 C.F.R. § 291.3 (1999). This is not a case where the alleged harm could be ameliorated by independent legal contingencies. *Texas v. United States*, 523 U.S. 296, 300 (1998).

In sum, any contingencies that would counsel a prudential refusal to address the merits of New Mexico's challenge stem from the complained-of regulations. If the Secretarial Procedures were not available to the Pueblo, it would either be forced to negotiate with New Mexico (essentially on New Mexico's terms) or it would not have legal authority to conduct Class III gaming. For the same reason, the Part 291 regulations' impact is not "mere uncertainty as to the validity of a legal rule" itself that would be insufficient to justify judicial review at this point. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003). Rather, the uncertainty caused by the eligibility determination causes New Mexico to "make decisions and considerable expenditures in the face of uncertainty." *First Commodity Corp. of Boston v. Commodity Futures Trading Comm'n*, 644 F. Supp. 597, 601 (D. Mass. 1986) (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 201–203, (1983)).

Nor is New Mexico's challenge to the Part 291 regulations a request for an advisory opinion from this court. *See* Defendants' Motion for Summary Judgment at 16. New Mexico is not seeking clarification of the validity of a regulation in order to make it easier to conduct its ordinary course of business. *Nat'l Park Hospitality Ass'n*, 538 U.S. at 811. New Mexico is challenging regulations that, if valid, fundamentally alter IGRA's post-*Seminole Tribe* status quo. The Secretary's eligibility determination impacts New Mexico's position in light of IGRA and *Seminole Tribe*: if this Court lets the Secretary's eligibility determination stand, compact

negotiations are no longer the exclusive avenue for Tribes to obtain legal authority to conduct

Class III gaming. This is exactly the sort of impact that counsels in favor of judicial review.

### VALIDITY OF 25 C.F.R. § 291 *et seq.*

If Congress tasks an agency with administration of a statute, the agency necessarily gains

the power to control the "formulation of policy and the making of rules to fill any gap left,

implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 843 (1984) (quotation omitted). *Chevron* sets forth a familiar two-step process for

determining whether an agency's action is permitted by statute. First, the reviewing court

determines if "Congress has directly spoken to the precise question at issue." *Id.* at 842. It does

this by looking at, "among other things," the statute's text, history, and purpose. *United

Keetoowah Band of Cherokee Indians of Okla. v. U.S. Dep't of Hous. and Urban Dev.*, 567 F.3d

1235, 1240 (10th Cir. 2009).

If the statute only permits one interpretation, agency regulations that fall outside this

permissible interpretation are invalid and unenforceable. *Chevron*, 467 U.S. at 843. If the statute

is ambiguous, then the second step involves determining "whether the agency's answer [to the

precise question at issue] is based on a permissible construction of the statute." *Id.* "The court

need not conclude that the agency construction was the only one it permissibly could have

adopted to uphold the construction, or even the reading the court would have reached if the

question initially had arisen in a judicial proceeding." *Id.* n. 11.

New Mexico first argues that Congress has not charged the Department of the Interior

with administration of IGRA as a whole, and therefore this Court cannot even consider whether

the Procedures are permissible formulations of IGRA's policies. New Mexico Motion for

Summary Judgment at 16 n. 4. Congress did grant general authority over the administration of

IGRA to the National Indian Gaming Council. 25 U.S.C. § 2706(b)(10). But IGRA also gives the Secretary of the Interior specific authority to implement regulations to allow a Tribe to conduct gaming in the event a state refuses to negotiate with it. 25 U.S.C. § 2710(d)(7)(B)(vii). Thus the question is not whether the Secretary has authority to implement procedures at all. It is whether IGRA allows the implementation of procedures in response to a State's assertion of sovereign immunity.

### a. IGRA is unambiguous because it clearly requires a finding of bad faith and court-ordered mediation before the Secretary may adopt gaming procedures.

The parties dispute how to characterize the question IGRA has or has not spoken to. Defendants argue that the issue is what happens when a State causes the dismissal of a Tribe's bad faith lawsuit by invoking its sovereign immunity under the Eleventh Amendment. Defendants' Motion for Summary Judgment at 19. New Mexico frames the issue as whether IGRA has spoken to the situations where the Secretary may adopt regulations allowing a Tribe to conduct gaming activities without a compact with the State. New Mexico argues that because IGRA provides for only one circumstance in which the Secretary has this authority (a federal court finding of bad faith), *expressio unius est exclusio alterus*: Congress did not intend to allow the Secretary to exercise this authority in any other situation. *See Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007) (arguing same).

Defendants insist that this case is analogous to *Pittston Co. v. United States*, 368 F.3d 385 (4th Cir. 2004). *Pittston* was precipitated by *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998). In *Eastern Enterprises*, the United States Supreme Court considered the constitutionality of 26 U.S.C. § 9706(a)(3). That statute was part of a scheme designed to reassign pension and medical care obligations from defunct coal companies to those companies still in business. *Pittston*, 368

F.3d at 391–92. In *Eastern Enterprises*, the United States Supreme Court held that § 9706(a)(3) caused an unconstitutional taking in violation of the Fifth Amendment as applied to Eastern Enterprises because it, and other similarly-situated companies, had not signed an agreement promising coal workers lifetime retirement benefits. *Eastern Enterprises*, 524 U.S. at 509, 530, 535.

*Pittston* concerned the Commissioner of Social Security's reassignment of certain obligations in order to avoid the type of unconstitutional taking described in *Eastern Enterprises*. In short, while a statute provided for an unconstitutional assignment in the first instance, the Commissioner of Social Security made the assignment as if the company that would have been assigned the obligation in the first instance did not exist. *Pittston*, 368 F.3d at 403. The Court noted that

> "[w]hen *Eastern Enterprises* held that it was unconstitutional to assign retirees to Eastern under the Coal Act, the ruling effectively held that the Commissioner *should never have assigned* retirees to Eastern *in the first place.* Because the Commissioner's assignments were invalid from the beginning, she had to start over to assign the beneficiaries to comport with the terms of the statute as well as the Constitution.

*Id.* (emphasis original).

Defendants argue that the Secretary's authority to adopt procedures without a finding of bad faith and court-ordered mediation is the same as the Commissioner's authority to make assignments in *Pittston*. If the Commissioner of Social Security could make assignments in a way that avoided unconstitutional outcomes, Defendants argue, then the Secretary can adopt procedures without waiting for the satisfaction of an unconstitutional statutory prerequisite. But phrased this way, it is clear that the authority the Secretary seeks to exercise here is categorically different from the regulatory authority exercised by the Commissioner in *Pittston*. *Pittston* involved a statute that indisputably called for administrative involvement from the offing. It

tasked the Commissioner of Social Security to assign obligations, and the Commissioner merely discharged his duty in a way that "comport[ed] with the terms of the statute as well as the Constitution." *Id.*

In contrast, there is no real dispute that the Part 291 regulations, if valid, are constitutional. Instead, the issue in this case is whether and when IGRA itself allows the Secretary to adopt such regulations. On this count, IGRA is unambiguous: the Secretary may only adopt procedures after a federal court finds the State has failed to negotiate in good faith and ordered mediation between the parties. Congress's failure to anticipate States' ability to sabotage IGRA's remedial process does not make Congress's delegation of authority to adopt procedures any broader: IGRA remains clear that this authority only arises after a federal court finds bad faith and the State passes up its remaining chances to negotiate a compact after such a finding. 25 U.S.C. § 2710(d)(7)(B)(iii).

This point is reinforced by the fact that Congress did not delegate authority to the Secretary to fill gaps anywhere they cropped up in IGRA. Instead, Congress conferred general rulemaking and administrative authority on the National Indian Gaming Counsel (NIGC), an independent agency within the Department of the Interior. 25 U.S.C. § 2706(b)(10); *Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1265 (10th Cir. 2001), *superseded in part by statute*, Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 107-63, 115 Stat. 414 (2001). Even if IGRA is ambiguous as to the situations where gaming procedures are permitted, the fact that Congress assigned to the NIGC, not the Secretary of the Interior, the responsibility to take reasonable measures to fill this gap reinforces the conclusion that Congress wanted the Secretary to implement procedures in one situation, and one situation alone.

Defendants' arguments about IGRA's purpose and legislative history are similarly unavailing. True, IGRA was Congress's attempt to carefully balance tribal and state interests. S. Rep. No. 100-446, at 1–2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071. But it also reflects Congress's conclusion—after input from the U.S. Department of Justice—that the compacting process, not the Federal government, should determine the niceties of Class III gaming on tribal lands. *See id.* at 6, 1988 U.S.C.C.A.N. at 3076 ("[IGRA] does not contemplate and does not provide for the conduct of class III gaming activities on Indian lands in the absence of a tribal-State compact.").

And while IGRA gives the Secretary authority to implement gaming procedures in the absence of a compact, any procedures must be "consistent" with a compact selected by a mediator who has had the benefit of seeing the Tribe and the State's "last best offer." 25 U.S.C. § 2710(d)(7)(B)(iv), (vii). The Secretary's attempted mitigation—asking the State for a proposal, *see* 25 C.F.R. § 291.7(c)—puts three seats at a table that Congress only set for two. *See* S. Rep. 100-446 at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083. Congress did not intend to turn the compacting process into a game of musical chairs: unless a federal court concludes New Mexico has acted in bad faith, IGRA requires New Mexico and the Pueblo to negotiate a compact between themselves.

This Court acknowledges its obligation to construe statutes to the benefit of Indian tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 765 (1985). The Court has long supported the principles of tribal sovereignty, self-determination, and economic self-sufficiency.[9] But because IGRA unambiguously specifies when the Secretary of the Interior may implement

---

[9] *See, e.g.*, *Atkinson Trading Co. v. Navajo Nation*, 866 F. Supp. 506 (D.N.M. 1994); *United States v. Corrow*, 941 F. Supp. 1553 (D.N.M. 1996); *United States v. Gonzales*, 957 F. Supp. 1225 (D.N.M. 1997); *Navajo Nation v. Intermountain Steel Buildings, Inc.*, 42 F. Supp. 2d 1222 (D.N.M. 1999).

gaming procedures permitting a Tribe to conduct class III gaming without a compact, "that is the end of the matter[.]" *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984). IGRA's text is clear, and this Court must "give effect to the unambiguously expressed intent of Congress." *Id.* at 843. The Part 291 regulations run contrary to Congress's clear intent and are unenforceable for this reason. And while this construction of IGRA clearly does not benefit the Pueblo of Pojoaque, this Court's obligation to construe IGRA to the Pueblo's benefit only arises when a statute is ambiguous. Because IGRA is not ambiguous, the Court may not construe it otherwise in order to benefit the Pueblo of Pojoaque.

This Court sympathizes with the Pueblo of Pojoaque's situation. New Mexico's ability to prevent federal court oversight of its behavior during negotiations has essentially left New Mexico in an unassailable position in a process that Congress clearly intended to take place between "equal" sovereigns. S. Rep. 100-446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083. But the fact that the unambiguous terms of a statute give rise to absurd or anomalous results does not give a federal court any license to revise the statute in order to avoid those outcomes. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2033 (2014). Nor does Congress's overall intent in passing IGRA diminish the fact that Congress has spoken clearly about when the Secretary may adopt regulations permitting tribal Class III gaming activities without a compact. Because the Part 291 regulations run contrary to Congress's clear intent, they are invalid.

**b. IGRA remains severable.**

Defendants suggest that if the Part 291 regulations are invalid in all cases, this Court must determine "whether IGRA's Compact provisions should be severed in their entirety." Pueblo of Pojoaque Motion at 11. Since IGRA has a severability clause, 25 U.S.C. § 2721, there is "a

presumption that Congress did not intend the validity of [IGRA] to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). Thus, the question becomes whether there is "strong evidence" that Congress would not have enacted IGRA to remain in effect without the invalidated section. *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1299 (9th Cir. 1998).

The Ninth Circuit Court of Appeals in *Spokane Tribe* found strong evidence Congress would not have passed IGRA had it known it could not constitutionally grant Indian tribes the right to sue States for failing to negotiate in good faith. *See id.* at 1300 (quoting and discussing statement of Senator Daniel Inouye, chair of the Senate Committee on Indian Affairs at the time of IGRA's passage and one of IGRA's authors). But the Ninth Circuit's discussion is *obiter dicta* at best: *Spokane Tribe* only considered the propriety of a preliminary injunction barring a Tribe from conducting Class III gaming without a compact in place. *Id.* at 1301.

Moreover, the *Spokane Tribe* court concluded elsewhere that there remain ways that IGRA can be made to function "close enough to what Congress had in mind" when it passed it. *Id.* at 1301. Even without the Part 291 regulations in place, IGRA provides a way for a Tribe to obtain a compact: agreement with the State or Secretarial Procedures implemented after a finding of bad faith and court-ordered mediation. The United States Supreme Court has blocked one of these paths when a State refuses to waive its immunity under the Eleventh Amendment. But while the Pueblo of Pojoaque is effectively precluded from obtaining a ruling on its allegations of bad faith, it appears that nothing prevents the United States from doing so as the Pueblo's trustee. *United States v. Spokane Tribe of Indians*, 139 F.3d 1297, 1302 (9th Cir. 1998).

The fact that the Pueblo of Pojoaque's choices under IGRA are constrained to its detriment does not render the entirety of IGRA "incapable of functioning independently" from

its jurisdiction-granting clause. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (citing *Hill v. Wallace*, 259 U.S. 44, 70–72 (1922)). Accordingly, this Court declines Defendants' request to invalidate any provision of IGRA other than the one invalidated by the United States Supreme Court in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996).

## CONCLUSION

New Mexico has standing to challenge the Secretary of the Interior's determination that the Pueblo of Pojoaque is eligible to obtain procedures allowing it to conduct Class III gaming. The Secretary's eligibility determination is a final agency action, and New Mexico's challenge is ripe for judicial review. The Indian Gaming Regulatory Act unambiguously states when the Secretary of the Interior may adopt regulations permitting an Indian tribe to conduct Class III gaming on its territory without a negotiated gaming compact in place. Because the regulations in 25 C.F.R. § 291 *et seq.* contradict the only permissible construction of IGRA's remedial provisions, the only way for this Court to give effect to Congress's intent is to bar Defendants from taking any further action to enforce 25 C.F.R. § 291 *et seq.*

IT IS ORDERED THAT:

1.  Plaintiff New Mexico's MOTION FOR SUMMARY JUDGMENT (Doc. No. 39) is

    GRANTED;

2.  Defendants Department of the Interior and Sally Jewell's MOTION FOR

    SUMMARY JUDGMENT (Doc. No. 37) is DENIED; and

3.  Intervenor Defendant Pueblo of Pojoaque's JOINDER AND MEMORANDUM IN

    SUPPORT OF DEFENDANT'S [sic] MOTION FOR SUMMARY JUDGMENT

    (Doc. No. 38) is DENIED.


_____

SENIOR UNITED STATES DISTRICT JUDGE